## Commonwealth *v.* Alden Coal Company, Appellant.

*Constitutional law—Constitution of Pennsylvania, Art. IX, Sec. 1—Uniformity of taxation—Act of June 27, 1913, P. L. 639.*

1. The right of the legislature to classify subjects within its jurisdiction for the purposes of enacting laws is unquestioned, so too is its right to determine what things shall be subject to tax for public purposes; but in both instances the right can be exercised only in subordination to certain constitutional restrictions. The legislature may not by arbitrary discrimination subject certain property to tax and exempt other property of the same class and similarly situated from an equal burden. It may discriminate between two of a class in this respect by method of classification, but it can do this only when a substantial difference exists, operating to make the distinction just and reasonable, and the legislation based thereon agreeable to something more than the legislative notion of expediency.

2. In determining whether legislative classification is special and discriminatory, regard must be had to the purpose for which the legislation is designed. Differences which make classifications for some purposes proper, may furnish no reasonable basis for classification for other purposes; it is their relation to the end proposed by the particular legislation that determines whether classification is warranted.

3. The Act of June 27, 1913, P. L. 639, providing for levying a tax on anthracite coal and for the collection and distribution of the same violates Section 1, of Article IX, of the Constitution of Pennsylvania, directing that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, in that it makes an artificial and arbitrary distinction between anthracite and bituminous coal, subjecting the former to tax for public purposes and not the latter, and is void.

Mr. Justice FRAZER and Mr. Justice POTTER dissent.

Argued July 2, 1915. Appeal, No. 20, May T., 1915, by defendant, from judgment of C. P. Dauphin Co., Commonwealth Docket, 1914, No. 65, for plaintiff on appeal from tax settlement of an account by the Auditor General and State Treasurer, in case of Commonwealth of Pennsylvania v. Alden Coal Company. Before BROWN, C. J., MESTREZAT, POTTER, ELKIN, STEWART, MOSCHZISKER and FRAZER, JJ. Reversed.

Appeal from tax settlement by the auditor general and State treasurer. Before KUNKEL, P. J.

The opinion of the Supreme Court states the facts.

The court entered judgment for the Commonwealth for the amount of its claim. Defendant appealed.

*Error assigned,* among others, was the judgment of the court.

*W. S. Snyder,* with him *C. B. Miller, J. T. Olmsted* and *A. C. Stamm,* for appellant.—The Act of June 27, 1913, P. L. 639, is special and local legislation prohibited by Section 7 of Article III of the Constitution of Pennsylvania: Morrison v. Bachert, 112 Pa. 322; Roumfort Company v. Delaney, 230 Pa. 374; Scowden's App., 96 Pa. 422; McCarthy v. Commonwealth, ex rel., Griffiths, 110 Pa. 243; City of Scranton School District's App., 113 Pa. 176; Ayars' App., 122 Pa. 266; Frost v. Cherry, 122 Pa. 417; Perkins v. Philadelphia, 156 Pa. 554; Blankenburg v. Black, 200 Pa. 629; Sample v. Pitts-

burgh, 212 Pa. 533; Commonwealth v. Casey, 231 Pa. 170; Durkin v. Kingston Coal Co., 171 Pa. 193.

*William M. Hargest,* Deputy Attorney General, and *Francis Shunk Brown,* Attorney General, for appellee.— The Act of June 27, 1913, P. L. 639, is proper classification: Commonwealth v. Martin, 107 Pa. 185; Stanley v. Supervisors of Albany, 121 U. S. 535; Commonwealth v. National Oil Company, 157 Pa. 516; Commonwealth v. Mill Creek Coal Co., 157 Pa. 524.

The Act of 1913 does not grant any exemption from taxation: Academy of Fine Arts v. Philadelphia County, 22 Pa. 496.

OPINION BY MR. JUSTICE STEWART, October 28, 1915:

By Act of Assembly approved June 27, 1913, P. L. 639, entitled "An Act levying a tax on anthracite coal and providing for the collection and distribution of the same," every ton of anthracite coal of the weight of 2,240 pounds avoirdupois, prepared for market within the State, is made subject to a State tax of two and one-half per centum of the value thereof, the same to be settled and collected as provided by law for other taxes. By the second section of the act every operator of anthracite mines is required to report to the auditor general in the month of January the number of tons of coal mined by such operator within the calendar year next preceding, and the value thereof prepared for market. Complying with this requirement, but protesting against its liability to make such report or to pay such tax, the appellant company filed with the auditor general on 31 January, 1914, a report showing the anthracite coal mined and prepared by it for market during the period beginning 28th June, 1913, and ending 31st December, 1913. Thereupon, 29th June, 1914, the auditor general settled an account against appellant which was approved by the State treasurer, in which tax to the amount of $7,-

792.86 was charged against appellant. From this settlement an appeal was taken to the Court of Common Pleas of Dauphin County, the ground of complaint being that the act authorizing the collection of such tax was unconstitutional and void. The case by agreement was heard by the court without the intervention of a jury. The determination reached was that the act was constitutional and effective, and that the account in question had been properly settled. Judgment was accordingly rendered in favor of the Commonwealth and against the defendant for the amount of the tax. The present appeal is from the judgment so entered, and the same questions are raised here as were presented and considered in the court below. If we should not allow so wide a scope to the inquiry as was given it in the court below, and was assumed upon the argument to be necessary to its determination, the reason will be made apparent as we proceed.

The appeal challenges the constitutionality of the act referred to. One ground on which the challenge rests is that the act violates Section 1, Article IX, of the Constitution, which directs that "all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax," inasmuch as it makes artificial and arbitrary distinction and discrimination between anthracite and bituminous coal, subjecting the former to tax for public purposes and not the latter. The fact that the act does make distinction between the two commodities is patent, and the one question we have to deal with is whether the distinction thus made rests upon such substantial difference as makes either variety a proper subject of this particular exclusive legislation. If this question can be answered in the affirmative, it must follow that the act is not open to the objection urged; for while it does subject to taxation but one of the two varieties of coal, if the variety taxed so differs from that not taxed, in respect to matters proper for consideration in the laying of the tax for

public revenue as to make exclusive legislation for the former reasonable and not arbitrary, it may properly be put in a class by itself for such purpose, and the legislation with respect to it then becomes general and not special, since it operates uniformly upon all within the class. If this result be reached in our inquiry, it must follow as well that the tax here prescribed is not discriminatory but uniform, in the sense in which that word is used in the Constitution.

In determining whether legislative classification is special and discriminatory regard must be had to the purpose for which the legislation is designed. Differences which make classification for some purposes proper, may furnish no reasonable basis for classification for other purposes, it is their relation to the end proposed by the particular legislation that determines whether classification is warranted. That differences real and substantial exist between anthracite and bituminous coal such as amply justify their separate classification for certain purposes, is without question. While both are natural products and the chief use of each is the same—the development of heat by combustion—yet they are distinguishable in so many ways, not only in their efficiency, but in respect to conditions under which they are found, conditions under which they are mined, and the processes by which they are severally made marketable, that if both were to be subjected in all respects to the same legislative requirements, it would result in embarrassing each by imposing upon both regulations and restrictions entirely proper and necessary in the case of one but wholly unnecessary and oppressively burdensome upon the other. That the constitutional restraints and limitations upon legislative power were never intended to work such unequal and inequitable results is apparent, and so whenever it has occurred that conditions in respect to one variety of coal and not the other, called for specific legislative action with respect to it, the legislature has without question or hesitation, for the particular pur-

pose before it, placed the variety calling for the legislation in a class by itself and legislated with respect to it to the exclusion of the other.   Our several statutes regulating the operation of coal mines, the employment of labor therein, the standard weight of each variety of coal, and distinguishing between the two varieties in many ways, all show this; but it will be found upon examination that whenever distinction is made between the two it is based upon a substantial difference, that is, one so marked as to call for separate legislation; and further, that in every case there is correspondence between the difference which is made the basis of the classification and the object and purpose of the statute. . The case of Durkin v. Kingston Coal Company, 171 Pa. 193, is a fair illustration.   The fact that the statutes referred to have been upheld as constitutional can be of no significance in our present inquiry except as we find like conditions here; first, a classification resting upon a difference between the two varieties peculiarly requiring it to the end that injustice and inequality might be avoided; and second, a correspondence between the difference which is made the basis of the classification and the design and purpose of the proposed or enacted legislation; for, except as there be correspondence, the distinction is capricious.   The right of the legislature to classify subjects within its jurisdiction for the purpose of enacting laws is unquestioned; so too is its right to determine what things shall be subject to tax for public purposes; but in both instances the right can be exercised only in subordination to certain constitutional restrictions.   The legislature may no longer by arbitrary discrimination subject certain property to taxation, and exempt other property of the same kind and class and similarly situated from an equal burden.   It may discriminate between two of a class in this respect by method of classification, but it can do this only when a substantial difference exists operating to make the distinction just and reasonable, and the legislation based

thereon agreeable to something more than legislative notion of expediency. It must rest on a difference which bears a natural, reasonable and just relation to the act in regard to which the classification is proposed; or, as stated by Mr. Justice BREWER in Gulf, Colo. & Santa Fe Ry. Co. v. Ellis, 165 U. S. 150, and quoted approvingly by STERRETT, C. J., in Juniata Limestone Co., Ltd., v. Fagley, 187 Pa. 193, 197, "it must appear not only that a classification has been made, but also that it is one based upon some reasonable grounds, some difference which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection." It is constantly to be borne in mind that the right of classification is allowed in order to avoid or correct inequalities, never to create them. It is quite true that the details of the legislation with respect to taxation for public purposes, and the exemptions proper to be made, rest primarily within the discretion of the legislature, and in classifying subjects for taxation it cannot be required to state the grounds of the classification; but it is no less true that the action of the legislature in any particular case is subject to judicial revision to the extent of seeing that the classification adopted rests upon real distinctions, not artificial or irrelevant ones, in the subjects classified, and has not been adopted for the purpose of evading any constitutional prohibition. When upon judicial revision it clearly appears that the classification adopted rests upon no substantial difference in the subject, that, whatever, the difference, it bears no correspondence to the end and object of the act, the right and duty of the court to assert and maintain the supremacy of the Constitution, even though it means the defeat of the legislation, is too apparent to invite argument.

Now upon what difference between these two varieties of coal can this discrimination which has for its object the subjection of the anthracite variety to taxation to the exclusion of the bituminous, rest? That they belong to

one general class, are closely and intimately related both in respect to origin and use, is not open to dispute. Dif-ferences there are as we have before indicated, and where-ever, because of these, the same legislation governing both would be unjust or oppressive to either, classifica-tion has properly been resorted to; but neither singly nor in combination do these differences suggest a reason why one should be taxed and not the other, whether re-gard be had to diversity in inherent or incidental quali-ties, diversity in commercial uses, in method of produc-tion, or even incompatibility or inconvenience in adopt-ing the same method of taxation for both. A single dif-ference as a basis of classification is suggested in the brief of argument on behalf of appellee. It is thus stated in the brief submitted, "The court, of its own knowledge, knows that the price of anthracite coal ranges from four to eight dollars per ton, and the price of bituminous coal ranges from one to two dollars per ton. The reason is that anthracite coal is found almost exclusively in the State of Pennsylvania. The United States government has engaged in litigation to separate the coal carrying roads from the great coal corporations, notably the Reading Coal and Iron Company, upon the theory that there is an illegal combination or trust. Proof of these facts is not necessary. The court only needs to find from human experience, some possible rea-son which induced the legislature to make the classifica-tion." There may be something herein implied that would indicate a difference beyond that of market price in the two varieties, but certainly nothing beyond it is expressed. It may be that what is implied would be a proper consideration in determining a line of public policy, but we are not here dealing with questions of public policy, but with a single question of constitutional restriction upon legislative power to tax for public revenue. The one reason expressed is so wholly inade-quate as a basis of differentiation that we need take no time in discussing it. It involves the proposition that it

is competent for the legislature by process of classification on the basis of market value, to throw the entire burden of the tax upon a selected few of an entire class, undistinguishable in its members in any other regard. And yet on this very crux of the case we have but this one suggestion of difference as a basis for classification; namely, market price or value. Were such rule to be recognized the legislature would be invested with a discretion as wide and unrestrained as it originally exercised, but which the people by their constitution declared should be confined within certain fixed limitations, one of which was that taxation should be uniform upon subjects of the same class. To allow the legislature arbitrarily to determine the class would be to defeat the very object of the constitutional restriction, and make taxation an instrument not of revenue but of monopoly.

And so we recur to the main and only inquiry, what difference is there between anthracite and bituminous coal that makes the one, when prepared for market, a proper subject for taxation, and not the other? Our answer must be, after the most careful consideration of the question, in the light of the findings of the learned judge who heard the case in the court below, and the arguments advanced on the part of the Commonwealth, that we discover none. Not only so, but as one result of our inquiry we find that the classification adopted instead of tending to promote equality in taxation must necessarily have a contrary effect, to the manifest prejudice of the interest subjected to the tax. Take but one illustration. It is a fact found by the learned judge of the court below, not excepted to, that of the total annual tonnage of anthracite coal, amounting to upwards of ninety-one millions of tons, forty per cent. is sold in keen competition with bituminous coal in the fuel market. Here then we have two commodities in active competition, to the extent of nearly the one-half of the total production of one of them, in the open market; one taxed two and a half per cent., ad valorem, on every ton

produced, and the other untaxed.    What effect this discrimination would have on the anthracite industry we do not know; it may be that the tax imposed is so moderate in amount that it would not cripple it in competition with the bituminous industry; but that is a matter aside from the present inquiry, it is the principle that concerns us.    The unrestrained power to tax is the power to destroy, and if the legislature may impose a tax of two and a half per cent., ad valorem, upon either commodity as distinguished from the other, we know of no constitutional restraint that would prevent it from increasing the tax to any limit it might see fit, even to the total destruction of the industry taxed.    The mere fact that competition in the general market exists to the extent indicated between these two products, ought to be in itself convincing that their separate classification for the purpose of taxation rests upon a purely arbitrary basis; and when this is followed by a tax upon one from which the other is exempt, the conclusion would seem inevitable that the whole scheme is defiantly repugnant to the constitutional requirement that all taxes shall be uniform upon the same class of subjects.    Referring to this provision in our Constitution, Mr. Justice PAXSON, speaking for this court in Appeal of Fox and wife, 112 Pa. 337, said (p. 352) : "This portion of the Constitution is too important and valuable to be overridden by the legislature or frittered away by judicial construction.    It was intended to, and does sweep away forever the power of the legislature to impose unequal burdens upon the people under the form of taxation.    The evils which led up to its incorporation into the organic law are well known.    The burden of maintaining the state has been, in repeated instances, lifted from the shoulders of favored classes and thrown upon the remainder of the community.    This was done by means of favoritism and class legislation.    Article IX of the Constitution was intended to cut out this system by the roots, and we shall have no more of it if the legislative and judicial depart-

ments of the government perform their full duty in giving effect to that instrument.    The taxing power of the State is great and searching.    Within the limits of the Constitution it is bounded only by the necessities of the State and the will of the people.    This must be so or the State might be without the means to sustain itself; to repress aggression from without, or to suppress disorder within.    So long as it lays its burdens upon all alike, there is hardly a limit to this power.    It may take from the people what its necessities demand.    The power of the State is conceded to select its subjects of taxation. It may tax mortgages, or it may omit to tax them.    But this tax, upon whatever laid, must be uniform.    It cannot tax A on his mortgages or horses and exempt B from a like tax —.    It is perhaps vain to expect that any system of taxation shall produce exact uniformity.    It is however both reasonable and possible to levy the taxes in such a manner that substantial justice and uniformity shall be the result."    This was said after the experience of a decade under the working of what was then the new Constitution.    Subsequent experience has furnished no reason for abating anything from what was then said as to the importance and value of the constitutional restriction upon the power of the legislature in the matter of taxation for public purposes, and the duty of the courts to withhold their sanction when, as in this case, the restriction has been plainly and unmistakably disregarded.

Another feature of the act to be remarked upon as further illustrating its repugnancy to constitutional provisions is to be found in section 5 of the act which directs that each county shall receive from the State treasurer, for the use of the several cities, boroughs, and townships thereof, one-half of said tax collected from operators in said county; and that the treasurers thereof shall, within thirty days thereafter, pay over the same to the treasurers of the several cities, boroughs and townships in said county pro rata according to their respective popu-

lations as shown by the last preceding United States census.

It is important in this connection to recall some of the more significant facts found by the court below. These are: that anthracite coal, the subject of the proposed tax, is found in but nine counties of the State, while bituminous coal is found and mined in twenty-four; that in 1913 the total anthracite tonnage was 91,626,956 tons and the total bituminous tonnage was 173,030,064 tons; that the tax imposed by the act upon the anthracite exclusively would, if enforced, amount to several million dollars annually, and the one-half thereof returned to the counties in trust for the several boroughs, cities, and townships thereof according to population would in some cases give to the municipality more than the entire tax raised therein for municipal purposes, and in a great many cases would approximate the total amount raised for municipal purposes, and would bestow upon many boroughs and townships which do not now and never have contained a pound of coal deposited within their limits large sums of money annually for the conduct of their municipal affairs, or for such municipal expenditures as such municipalities may see fit to make.

Keeping in mind that the one great purpose of legislative classification is to avoid the inequalities that would necessarily result from subjecting all the members or subjects of a natural class to uniformity of rule, is it not apparent that, whatever the purpose of this act, its certain effect would be not only an unjust and unwarranted discrimination in levying the tax, but a like unjust and unwarranted discrimination in its disbursement? Here we have a tax imposed yielding a revenue twice as large in amount as the State's requirements, and, for some undisclosed reason, the one-half of the total paid into the state treasury is directed to be paid over to the treasurers of the nine anthracite producing counties to be divided among the several municipalities therein. It is no less difficult to discover a substantial reason for this

than it is to discover a substantial reason for putting the two varieties of coal in separate classification. We are here again left to conjecture. The explanation attempted by the Commonwealth in its effort to sustain the act may be the correct one, but, if so, it must prove fatal to the act. We quote from the brief of argument submitted, "Great cities have been developed by the coal industry. The development of these cities has imposed great burdens upon the counties and resulted in large issues of bonds by both cities and counties. The time is fast approaching when the cities, because of the wealth of the coal becoming exhausted, will not be able to meet their oligations as they are now able to meet them. The exhaustion of the coal will impoverish the municipalities. To return to them the tax which comes from the coal mined in the county is fair and wise. The City of Carbondale now faces a great problem not only because of impoverishment but destruction, because the mines beneath it are on fire." Again, "The very fact of the mining operations themselves being so hazardous and annually resulting in awful accidents by which large numbers of wives are made widows, and great numbers of orphans and cripples are thrown upon the communities to support by taxation, demonstrates the necessity for a return of taxation to the communities and poor districts from which this wealth of coal is being removed." Here we have the only explanation of this unique legislation that is advanced. If it be accepted as correct, then it follows that this 5th section of the act transcends the power of the legislature, since it is an appropriation resting wholly and exclusively upon charitable and benevolent considerations affecting certain particular communities. Section 18 of Article III of the Constitution provides that no appropriation...... shall be made for charitable or benevolent purposes to any person or community. In view of this express prohibition we hardly think that it was dread of such dire consequences here foretold as awaiting the an-

thracite industry of the State, or newly awakened sym-
pathy for the unfortunate miner and his dependents, that
inspired this legislation.   And yet, we are unable of our-
selves to suggest any other explanation.   It is argued
that inquiry in regard to the purpose of the legislation is
irrelevant since the constitutional provision that taxa-
tion shall be uniform applies only to the levy and as-
sessment of the tax, and not to its expenditure or distri-
bution.   In one sense this is quite true; in another it is
wholly incorrect.   Conceding the uniformity of the tax
as laid, is such uniformity preserved when by the same
act that authorizes the tax it is provided that one-half
of the amount so realized shall be paid over to certain
favored communities?   What difference can it make
that the great bulk of all of the tax was derived from the
nine counties in which these particular communities or
municipalities are found?     That circumstance gives
them no claim for compensation.   While the tax is paid
in the first instance by the producers, ultimately it is
paid by the consumers, and by far the greater part of
the burden imposed must be borne by subdivisions which
are denied participation in the extra fifty per cent.   Had
the tax been general, that is to say, upon both anthracite
and bituminous coal, and had the act provided that one-
half of the sum realized should be returned to the coun-
ties producing the bituminous, would anybody contend
that such legislation would not offend against the con-
stitutional requirement that taxation must be uniform?
And yet that is what in effect is done here.   A tax is
laid on anthracite coal which consumers throughout the
State must pay, those residing in the anthracite counties
equally with those outside, but, to relieve those residing
within from their full share of the burden, one-half of all
that is paid, is to be returned to the municipalities in
which they and producers are taxable, and to this extent
they are relieved from local taxation.   A still more fla-
grant violation of the rule requiring uniformity of taxa-
tion is seen in the fact found that in a great many cases

the tax would be distributed to boroughs and townships which do not now and never had a pound of coal within their limits, thus exempting them wholly from taxation. When the necessary effect of the legislation is to create inequality of burden as we here see it, are those complaining of the injustice to receive no other answer than that while the Constitution promises them equality in the matter of the taxation, because it failed to place restriction upon the legislature's right to distribute the tax it collects, therefore the purpose of the legislation is not to be inquired into? If constitutional requirements are to be circumvented by such simple and easy process of reasoning, the question may yet be asked derisively of the Constitution, what is all this worth?

The act in question is assailed on still other grounds than those we have discussed. Were we in any doubt as to the correctness of our conclusion that the act is in plain, open and palpable disregard of the constitutional requirement that all taxes shall be uniform upon the same class of subjects, it would be our duty to give like consideration to these other grounds of attack; but with the unconstitutionality of the act already determined on one wholly adequate ground, discussion of the other objections urged is unnecessary.

For the reason stated the judgment of the court below is reversed, and judgment is now entered for the defendant.

DISSENTING OPINION BY MR. JUSTICE FRAZER:

It is a fundamental principle of constitutional construction that, in determining whether or not a particular act of the legislature exceeds the powers of that body, every presumption is in favor of the validity of the act, and it will be declared void only where it violates the Constitution clearly and plainly and in such manner as to leave no doubt in the mind of the court. Whether or not the court approves of the wisdom or justice of the legislation is not the question. Protection

against unwise or unjust laws must be left in the hands of the people, who are responsible for placing the legislators in power. If their representatives disappoint them, their remedy is at the polls and not by application to the courts.

These principles are well settled, and have been frequently applied in cases dealing with the question of the power of taxation. Thus in Sharpless v. Mayor of Philadelphia, 21 Pa. 147, it was said by Mr. Chief Justice BLACK, page 161: "The great powers given to the legislature are liable to be abused. But this is inseparable from the nature of human institutions. The wisdom of man has never conceived of a government with power sufficient to answer its legitimate ends, and at the same time incapable of mischief. No political system can be made so perfect that its rulers will always hold it to the true course. In the very best a great deal must be trusted to the discretion of those who administer it. In ours, the people have given larger powers to the legislature, and relied, for the faithful execution of them, on the wisdom and honesty of that department, and on the direct accountability of the members to their constituents. There is no shadow of reason for supposing that the mere abuse of power was meant to be corrected by the judiciary. There is nothing more easy than to imagine a thousand tyrannical things which the legislature may do, if its members forget all their duties; disregard utterly the obligations they owe to their constituents, and recklessly determine to trample upon right and justice. But to take away the power from the legislature because they may abuse it, and give to the judges the right of controlling it, would not be advancing a single step."

The ideal system of taxation, of course, is that which causes the burden to fall upon the citizens in equal and just proportions; but such a system has never yet been devised, and in our complex state of society never will be. Hence it necessarily follows that the mere fact that

taxation produces inequality is not in itself sufficient excuse for declaring it a violation of constitutional rights: "If equality were practicable, in what branch of the government would power to enforce it reside? Not in the judiciary, unless it were competent to set aside a law free from collision with the Constitution, because it seemed unjust. It could interpose only by overstepping the limits of its sphere; by arrogating to itself a power beyond its province; by producing intestine discord; and by setting an example which other organs of the government might not be slow to follow. It is its peculiar duty to keep the first lines of the Constitution clear; and not to stretch its power in order to correct legislative or executive abuses. Every branch of the government, the judiciary included, does injustice for which there is no remedy, because everything human is imperfect. The sum of the matter is, that the taxing power must be left to that part of the government which is to exercise it. But what if this power were so managed as to lay the public burdens on particular classes in ease of the rest? It is illogical to argue from an extreme case; or from the abuse of a power to a negation of it. Every authority, however indispensable, may be abused; and if it might not, it would be powerless for good." Per GIB-SON, J., in Kirby v. Shaw, 19 Pa. 258, 261. In Grim v. Weissenberg School District, 57 Pa. 433, it was said by Mr. Justice SHARSWOOD, at page 437: "The power of the legislature to impose taxes, or to authorize their imposition by subordinate municipal authorities, is of necessity discretionary. To permit its wisdom, policy or even equality to be questioned judicially, would be to stop the wheels of government. Perfectly equal taxation will remain an unattainable good as long as laws and government and men are imperfect."

The power of the legislature to classify subjects and objects of taxation has always been recognized from earliest times as a necessary incident to the proper and just exercise of the right to tax. This power not only existed

before the adoption of the present Constitution, but was expressly recognized therein in Section 1, of Article IX, which requires all taxes to be uniform upon the same class of subjects within the territorial limits of the authority levying the tax: Com. v. Delaware Div. Canal Co., 123 Pa. 594.

In applying the fundamental principles above enunciated to the case before us, and though recognizing the rule that classification must be reasonable and not arbitrary, I am unable to agree with the majority of the court in holding the Act of 1913 a violation of the uniformity clause. It is admitted there is sufficient distinction between the mining and marketing of bituminous and anthracite coal to warrant their separation into distinct classes with separate legislation governing each: Durkin v. Kingston Coal Co., 171 Pa. 193. This fact alone is a strong circumstance, though perhaps not a conclusive one, that the legislature did not act arbitrarily in adopting this same classification for the purpose of taxation. But other differences exist between the properties and composition of the two kinds of coal, which are recognized by leading writers on geology and coal, and which seem amply sufficient to justify a classification for purposes of taxation without subjecting such act to the charge of arbitrariness or unreasonableness. Thus the various fuels are classed as wood, peat, lignite, bituminous and anthracite. Can it be said that wood and peat, for instance, could not be properly classified by the legislature because they are both fuels? Bituminous coal is found in almost every section of our continent, is black in color, quite soft, and is ready for market as soon as mined. The vein in which it is found rarely exceeds eight feet in thickness. On the other hand, anthracite coal is found only in a few counties in the eastern portion of this State, is lighter in color, quite hard, requires considerable preparation before it is ready for market, and the veins in which it is found are sometimes over one hundred feet in thickness. Anthracite coal

cannot be made into coke, nor does it produce gas, as is the case with bituminous coal. Without going into further details, there seems to be ample difference to sustain a classification for the purpose of taxation.

The validity of this classification seems to be fully sustained by the authorities. Bearing in mind that a classification of coal for other purposes has been upheld, the language of Mr. Chief Justice AGNEW in Kittanning Coal Co. v. Com., 79 Pa. 100, upholding a tax on coal companies in accordance with the amount of coal mined, becomes pertinent. "It is clear, therefore, that the moment we concede the power to classify, we have disposed of the question of uniformity, for then all that is required by the Constitution is uniformity of taxes among the members of the class. Now the power to classify is not only retained in clear language, but was held by the court to be continued in the case of Roup v. Pittsburgh, 21 Pitts. L. J. 190. This power was possessed under the Constitution of 1790, had been exercised in numerous laws, and existed when the new Constitution was framed and adopted. Thus, real estate had been classified as seated and unseated, and by various kinds, as houses, lands, lots of ground, ground-rents, mills, manufactories, furnaces, ferries, and others. The classification of personal property was equally various, to-wit: slaves, horses, mules, cattle, carriages, watches, bonds, mortgages, stocks, moneys at interest, profits, etc. So trades, professions, callings, and even single men, were taxed by classification. Taxes were laid in various forms, as rates on values, rates on dividends, or profits, and by specific sums on specified articles. These things were well known to the convention of 1873, yet no change was made in the power to classify, but it was recognized by saying that all taxes shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax, by the latter clause, even extending the power to classify by limiting the class to certain bounds." In Durach's App., 62 Pa. 491, it was held that a munic-

ipality might properly assess a tax upon saloon keepers
and gaming rooms without violating the constitutional
provision of uniformity.   It was there said by Mr. Jus-
tice SHARSWOOD, at page 494: "But in the legitimate ex-
ercise of the power of taxation, persons and things al-
ways have been and may constitutionally be classified.
No one has ever denied this proposition.   To hold other-
wise, would logically require that all the subjects of
taxation, as well persons as things, should be assessed,
and an equal rate laid ad valorem.   Practically no more
unequal system could be contrived.   It is generally
agreed, if not universally conceded, that the legislature
cannot impose upon the persons residing in a particular
locality or portion of the territory a tax for the benefit
of the whole State, nor on a borough or township for the
benefit of a county, any more than upon a single indi-
vidual.   Had the tax now in question been laid by the
corporate authorities of the Borough of Johnstown upon
the keepers of restaurants and drinking saloons, in any
particular quarter of the village, or upon any particular
individuals of the class, it would have been justly liable
to this objection.   If the taxation is upon all of a class,
either of persons or things, it matters not whether those
included in it be one or many, or whether they reside in
any particular locality or are scattered all over the
State.   If, for example, a general tax were imposed upon
all distilleries or owners of distilleries, it would not af-
fect the constitutionality of the tax if the distillers all
carried on their business in a particular section of the
country, or were few in numbers."   In Com. v. Delaware
Div. Canal Co., 123 Pa. 594, a tax upon the obligations of
private corporations different from obligations of indi-
viduals, was held a proper classification.   It was said
by Mr. Justice CLARK, at page 621, "Real estate, for
taxation, has been classified as seated and unseated, and
for municipal purposes may, perhaps, admit of further
classification: Roup's Case, 81½ Pa. 211.   Collateral
inheritances are distinguished from those that are direct,

the former being subject to taxation, the latter not. For-
eign insurance companies have been distinguished from
domestic companies, and taxed independently and differ-
ently: Germania Life Ins. Co. of New York v. Common-
wealth, 85 Pa. 513. So, trades, professions, callings, and
even single men have been taxed by classification, and it
has been said that professional men may be classified as
physicians, lawyers, clergymen, etc.; tradesmen as mer-
chants, mechanics, etc.; and other persons as bankers,
manufacturers, etc., and a uniform tax assessed upon
each class: Banger's App., 109 Pa. 79. Not only have
taxes been laid in all these various forms, rated on
values, on dividends or profits, on premiums, on net earn-
ings, and on gross receipts, but also by specific sums on
specific articles. The road bed, station houses, rolling
stock and equipments of a railroad company; the canal
bed, and berm banks, the locks, lock houses, etc., of a
canal company; the banking house or place of business
of a banking company, etc., are withdrawn from the or-
dinary processes of general taxation and are reached in
a tax upon capital stock, which has always been re-
garded as a tax upon the property and assets. The sev-
eral classifications and departures from uniformity in
methods, were intended simply to bring about a just
uniformity in results. So, places of amusement and the
luxuries of life may be taxed in relief of the necessaries.
Household and kitchen furniture, gold and silver plate,
exceeding a certain value, pleasure carriages, and gold
and silver watches, kept for use, prior to the Act of May
13, 1887, P. L. 114, were selected from the like articles in
trade, and from other articles of personal property, and,
with money at interest, were subjected to a special tax.
Illustrations might be multiplied to show that classifica-
tion does not depend upon differences in the physical na-
ture or condition of the subjects selected, but upon a
variety of considerations."

In Commonwealth v. Germania Brewing Co., 145 Pa.
83, a tax distinguishing between corporations manufac-

turing beer and other corporations was held valid. A classification of trust companies was held proper in Commonwealth v. Mortgage Trust Co. of Penna., 227 Pa. 163, and the classification of corporations in which securities are held in any other manner than for the whole body of stockholders was upheld in Provident Life & Trust Co. v. McCaughn, 245 Pa. 370. In People, ex rel., Iron Silver Mining Co. v. Henderson, 12 Colo. 369, a statute classifying mines for purposes of taxation into two classes, mines producing an annual output in excess of a certain sum, and all other mines, was held not such an unreasonable classification as would justify judicial interferences. And in Knisely v. Cotterel, 196 Pa. 614, it was said, quoting from an earlier case: "Classification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition. If the distinctions are genuine, the courts cannot declare the classification void, though they may not consider it to be on a sound basis. The test is not wisdom, but good faith in the classification."

Many other instances might be cited to show the various classifications which have been held proper and which seem to have no more legitimate reasons for their support than the classification in the present case. What argument can be advanced, for instance, which can logically condemn a classification of the two kinds of coal and yet sustain a separate classification of horses and mules, or of mortgages owned by corporations and those owned by individuals, or of mines in proportion to the yearly output?

In view of the difference in the nature, qualities and system of mining anthracite and bituminous coal, and of the fact that classification with respect to mining has already been sustained by this court, I am unable to concur with the majority of the court in holding the adoption of the same classification for purpose of taxation so

arbitrary and unreasonable as to constitute a violation
of the uniformity clause in the Constitution. The ques-
tion is not whether a sufficient reason has been given to
uphold the classification, but whether a sufficient reason
has been given for condemning it as unreasonable and
arbitrary. Every presumption is in favor of the consti-
tutionality of the act and it is incumbent upon one who
opposes it to satisfy the court of the soundness of his
contention. The mere fact that the two classes of coal
are of the same nature and used substantially for the
same purpose is no better reason for holding the classi-
fication improper than is the existence of the difference
in the price of the two classes of coal a conclusive reason
for holding the classification proper. Classification
does not depend merely upon difference in the physical
nature or condition of the subjects selected, but upon a
variety of considerations: Com. v. Delaware Div. Canal
Co., 123 Pa. 594. The differences pointed out above
seem amply sufficient to sustain the act.

If the classification is proper under our State Consti-
tution, the act would not conflict with the fourteenth
amendment of the United States Constitution guarantee-
ing to all equal protection of the laws. In District of
Columbia v. Brooke, 214 U. S. 138, it was said in dis-
cussing this amendment (page 150) : "We have repeat-
edly decided—so often that a citation of the cases is un-
necessary—that it does not take from the states the
power of classification, and also that such classification
need not be either logically appropriate or scientifically
accurate. The problems which are met in the govern-
ment of human beings are different from those involved
in the examination of the objects of the physical world,
and assigning to them their proper associates. A wide
range of discretion, therefore, is necessary in legislation
to make it practical, and we have often said that the
courts cannot be made a refuge from ill-advised, unjust
or oppressive laws."

Neither can I agree with the majority of the court that

Section 5 of the Act of June 27, 1913, P. L. 639, which provides that the State treasurer shall pay to the county for the use of the several cities, boroughs and townships thereof one-half of the tax collected from operators within said county, violates any constitutional provision. The requirement that taxes shall be uniform refers to assessment and collection thereof and not to their distribution. While it may be assumed an equitable apportionment of taxes is contemplated in every system of government, this is a matter resting within legislative discretion (Gordon v. Cornes, 47 N. Y. 608), and in the very nature of the case a larger amount of public funds must at times be spent in one place than in others. The constitutionality of the tax under the uniformity clause must be determined by the method of assessment and collection. If the method adopted is proper, the question of expenditures of the money is a distinct one and must be decided in a proper proceeding to enjoin its expenditure in the manner contemplated. 37 Cyc. 746. The case of State v. Western Union Tel. Co., 73 Me. 518, is in point. The tax collected from telegraph companies was directed to be distributed in part to certain towns in the State in proportion to the number of shares of stock of the company held in such towns. The effect was to distribute the tax among a very few towns. In holding the act valid, the court said (page 531) : "It is objected in this case that the distribution of this tax, as provided in the act, shows that it is not for a legitimate purpose. What distribution was contemplated is somewhat difficult, perhaps impossible, to ascertain from the act itself. If it is all to go to the towns, it would still be a public purpose. But that is a matter which is not now involved. The tax is imposed by the State. It is to be paid to the State treasurer as other public funds. It then becomes a public fund to be used for a public purpose. If diverted from that, the remedy is not by a refusal to pay. If the last section of the act should prove to be in violation of the Constitution, or void for uncer-

tainty, it does not affect the remainder. This is not a case where one district is required to pay a tax for the support of another. It is like other excise taxes raised in any part of the State to be appropriated by the State wherever its needs or its sense of justice may require."

Among other authorities sustaining the same principle are: People v. Hawes, 34 Barb. 69; State v. Mudgett, 57 Pac. 351; Holton v. Board of Commissioners of Mecklenburg County, 93 N. C. 430; Kerr v. Perry School Township, 162 Ind. 310. In Kirby v. Shaw, 19 Pa. 258, a special tax added to borough rates over and above the county rate, for the purpose of defraying the expense of erecting a county court house within the Borough of Towanda, was held constitutional, even though the inhabitants of the borough were thus to assume an additional burden over that assumed by other taxpayers of the county. Many illustrations might be given to show the expenditure of public funds in a particular part of the State to the exclusion of other parts. The construction and maintenance of State highways is a notable example. This does not directly benefit taxpayers living far from the location of the highway, and yet they are compelled to help pay for the improvement. So long as the distribution of taxes by the State is for public purposes, and there is nothing in the Act of 1913 to indicate a distribution for any other purpose, the legislative discretion will not be interfered with.

In view of the decision of the majority of the court, no good purpose can be served by discussing the other questions of constitutionality raised in the case.

Mr. Justice ELKIN, before his death, read and concurred in this opinion.

Mr. Justice POTTER. I concur in this opinion.