## Clearfield Bituminous Coal Corporation *v.* Thomas et al., Appellants.

Submitted May 24, 1939; argued November 29, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*George M. Spence,* for appellants.

*Philip N. Shettig,* with him *Robert M. Fisher* and *Thomas A. Swope,* for appellee.

*William S. Rial,* Deputy Attorney General, with him *Claude T. Reno,* Attorney General, for intervenor.

OPINION BY MR. JUSTICE MAXEY, December 8, 1939: The County Commissioners of Cambria County appeal from the action of the Court of Common Pleas of that county in holding that the Act of July 18, 1935, P. L. 1196, 32 PS 75, is constitutional. If the decree of the court stands, the County Commissioners are bound to comply with the mandate of the Act and of the certificate of the Secretary of Forests and Waters, to wit: to reduce on their records the assessments upon certain surface lands of the appellee corporation to an amount not in excess of $1.00 per acre and to maintain such assessment until further notified by the Department of Forests and Waters.

The case was heard upon bill and answer. There was no dispute as to the facts. These are, inter alia, as follows: Plaintiff is the owner of a tract of unseated surface land containing 416 acres situate in Chest Township, Cambria County. Pursuant to the provisions of the Act of June 5, 1913, P. L. 426, plaintiff caused this land to be classified as auxiliary forest reserves and entered into a contract with the State Forestry Reservation Commission as provided by that act. The commission thereupon certified the land to the County Commissioners of Cambria County and thereafter plaintiff's land was valued for the purpose of taxation at the rate of $1 per acre under the provisions of the Act of 1913. One of the courts of common pleas of this Commonwealth declared this Act of 1913 unconstitutional, and no appeal from such decision having been taken, the Secretary of Forests and Waters, who had succeeded to the powers and duties of the State Forestry Reservation Commission, acting upon the opinion and advice of the Attorney General of this State, notified in October, 1934, the owners of all lands classified as auxiliary forest reserves under the Act of 1913, and the County Commissioners of the several counties wherein such lands are situate, that the contracts between the several owners and the State Forestry Reservation Commission as provided by that act were canceled.

Subsequently, the now challenged Act of July 18, 1935, P. L. 1196, was passed. Section 2 provides that "all surface land which would be suitable for the growing of merchantable forest products, whether they are now growing or shall hereafter be planted out, sown by seed, or reproduced naturally, and would thereby contribute to an adequate lumber supply for the people, protect the water supply, and give aid to flood control, and to the prevention of soil erosion, may be set apart according to the provisions of this act and exclusively used for growing trees for production of such merchantable products, and is hereby constituted a separate and dis-

tinct class of land to be known as forest reserves auxiliary to the State owned forest reserves. . . ." This section further provides the method whereby the owner of surface land may cause his land to be included in the aforementioned classification. Section 8 provides, inter alia, that all surface land classified and set apart as auxiliary forest reserves under the provisions of the Act shall be rated in value for the purpose of taxation not in excess of $1.00 per acre and shall continue to be so rated so long as the land remains within the class established by section 2. Section 9 requires the County Commissioners to reduce the assessment on their records to a sum not in excess of $1 per acre.

Except for the nominal tax resulting from the assessment of the land so classified, at $1 an acre, no tax is paid on the land until the trees are "harvested," at and after which time "ten per cent of the stumpage value of the trees" is payable, as provided in section 10 of the Act. As to *when* trees shall be harvested, section 4 provides as follows: "Whenever trees growing on said surface land have become suitable for merchantable forest products, the secretary shall, at the request of the owner, or on his own motion, make an examination of said land and designate for the owner the trees to be cut, if in the judgment of the secretary there be any, and the cutting and removal of said trees so designated shall be in accordance with the instructions of the secretary." A dispute between the secretary and the owner as to the desirability of the cutting and removal of the trees, is made a question for judicial determination.

This Act may be summarized as follows: For what it deems to be the general welfare, the legislature has provided a means by which the owners of certain types of lands can be almost wholly exempted from the payment of taxes for years and until the timber on those lands is "harvested." Whether or not any timber on such lands is ever harvested is left to the initiative of

either the owner or the Secretary of Forest and Waters. If neither of these persons wanted the timber harvested, it would not be, and no taxes would be paid on the land, except the nominal tax on a valuation of $1 an acre. If the timber is harvested, 10% of the stumpage value of the timber is payable as taxes. These stumpage taxes, therefore, might be paid fifty years after or at any other period, after the land was placed in the forest reserve class. If this stumpage tax, when, and if ever, paid, is divided by the number of years the land was in the favored class, the average tax per year would manifestly be of a rather small amount.

It is undeniable therefore that the Act now challenged is a *tax exemption* Act. That it does not *completely* exempt lands from taxation, does not alter the fact that it is *pro tanto* an act exempting lands from taxes they would otherwise bear. The contention that the stumpage tax when (if ever) paid is the equivalent of the sum of the annual taxes the land would otherwise have paid, is unsound. If such was the fact, that would defeat the very purpose of the Act, that purpose being to *reward* or *compensate* a landowner for setting aside his land "for growing trees." For his contribution to the general welfare in doing this, he is relieved, in respect to such land, of the payment of all taxes except the nominal tax on a valuation of one dollar an acre, until that date, presumably in the far future, when he or the Secretary of Forests and Waters may decide that the timber should be harvested. To put the matter concretely, A may own a tract of land assessable at $100 an acre. By having his land accepted as an auxiliary forest reserve, he immediately secures a 99% reduction in his taxation until the indefinite future date (which *may never* arrive) when the timber is harvested. Even if the timber is harvested after the landowner has enjoyed a long period of immunity from taxation, only a tax amounting to 10% of the value of the "harvest" is imposed. Averaging this over the term

of years the land has been exempt, makes the average annual tax much less (it may fairly be assumed) than it would have been had the land not been put in the preferred class.

With the wisdom of the legislature in translating into a statute this particular conception of sound public policy, we have nothing to do. The question presented to us is: Has the legislature the *power* under the Constitution to enact such a statute? This question the appellants emphatically answer: "No." They claim that it is a tax exemption statute and that therefore under section 2 of Article IX of the Constitution, it is void, for that section so declares unless the property exempted is the property enumerated in section 1 of Article IX (section 1, B of Article IX has no application here), to wit: A, Public property used for public purposes; B, Actual places of religious worship; C, Places of burial not used or held for private or corporate profit; D, Institutions of purely public charity; and E, Real and personal property owned, occupied and used by any branch, post or camp of honorably discharged soldiers, sailors and marines. It is, of course, well settled that when the Constitution enumerates the kind of property that may be exempted from taxation, it by implication excludes all other taxable property.

In *Cope's Est.*, 191 Pa. 1, 43 A. 79, this court declared unconstitutional the Act of May 12, 1897, P. L. 56, which act exempted personal property to the amount of $5,000 in the payment of the inheritance tax. This court, in an opinion by Chief Justice STERRETT, after referring to the above quoted sections 1 and 2 of Article IX of the Constitution, said: "These limitations on the power of the legislature mean something. They are plainly intended to secure, as far as possible, uniformity and relative equality of taxation, by prohibiting generally the exemption of a certain part of any recognized class of property, and subjecting the residue to a tax that should be borne uniformly by the entire

class, and *by guarding against any other device that necessarily or intentionally infringes on the established rules of uniformity and relative equality* which, as we have seen, underlie every just system of taxation," (italics supplied).

In the notable concurring opinion of Justice FIELD in *Pollock v. Farmers' Loan & Trust Co.*, 157 U. S. 429, at 595, it is said: "Exemptions from the operation of a tax always create inequalities. Those not exempted must, in the end, bear an additional burden or pay more than their share. A law containing arbitrary exemptions can in no just sense be termed uniform." He says further: "Hamilton says in one of his papers (the Continentalist): 'the genius of liberty reprobates everything arbitrary or discretionary in taxation. It exacts that every man, by a definite and general rule, should know what proportion of his property the state demands; whatever liberty we may boast of in theory, it cannot exist in fact while [arbitrary] assessments continue': 1 Hamilton's Works (ed. 1885) 270."

Cooley on Taxation (4th ed.), Vol. 2, sec. 653, p. 1374, says: "It is difficult to conceive of a justifiable exemption law which would select . . . single articles of property, and taking them out of the class to which they belong, make them the subject, of capricious legislative favor. Such favoritism could make no pretence to equality; it would lack the semblance of legitimate tax legislation. . . . The motives of the exemption or the beneficial purposes expected to be accomplished by it can make no difference."

In the case of *Christley v. Butler Co.*, 37 Pa. Superior Ct. 32, that court, declared unconstitutional, as violative of sections 1 and 2 of Article IX, the Act of April 20, 1905, P. L. 246, entitled: "An Act to encourage the planting and the maintaining of sprout forest- and timber-trees, and providing that those who thus aid shall be exempt from taxation; defining the duties of the township assessor of taxes, and penalties for violation

of this act." That Act was avowedly intended to encourage the cultivation and preservation of timber for the general public good, but the Superior Court said as to that: "A laudable purpose does not warrant a disregard of the fundamental law of the state." That Act provided that any "owner of land who shall plant the same with forest- or timber-trees in number not less than 300 to the acre, shall have a rebate in his, her or its taxes, to the amount of 80% thereof, for a period of 35 years; Provided, That such rebate shall not amount to more than 45 cents per acre. . . ." The Superior Court said: "That act attempts to exempt landed property from taxation while the constitution says in plain terms that the general assembly is without power to so legislate, except as therein enumerated." The reasoning of the Superior Court in that case applies with equal force here. In that case, the legislature attempted a partial exemption of taxable property. Here the legislature attempted a partial exemption of taxable property. In both cases the legislature attempted to do something which the Constitution says it cannot do. That the exemption attempted in each case was only a partial exemption is immaterial. The difference between a hundred per cent exemption of property and a 99 per cent exemption or a 50 per cent exemption is only a difference in degree. All are odious to the constitutional principle of equality and uniformity. In *Koch v. Essex County Board of Taxation,* 97 N. J. Law 61, 116 A. 328, there was declared unconstitutional an act granting tax exemptions for five years "on any improvements to real estate for dwelling purposes," the act being one to meet a "public emergency" due to a post-war shortage of dwelling houses. The Supreme Court of New Jersey said: "A pressing emergency is no ground for violation of a constitutional provision, otherwise the legislature might constantly violate the Constitution upon the ground of some emergency."

There is nothing more inimical to constitutional government than judicial acceptance of the periodically popular tenet that constitutional limitations should yield to legislative conceptions of "general welfare" promotion. If this tenet is to prevail, the Constitution will become a mere symbol instead of the dominant charter of government it was ordained to be. Just as the 1905 and 1935 legislatures declared the public benefit to be derived from the cultivation of trees to be a warrant for the tax exemptions offered, so may future legislatures declare that the public benefit to be derived from the cultivation of potatoes or apple trees warrants the tax exemptions of the lands so used. The framers of the Constitution, recognizing the fact that every dollar of normal tax burden arbitrarily subtracted from the land of one citizen means a commensurate tax burden added to the property of all other citizens, restricted the legislature's power to exempt taxes to a few classes and then declared all other attempted exemptions "void."

Since the Act of 1935 is plainly a tax exemption statute, as the Superior Court declared the similar Act of 1905 to be, and since the property exempted is not within the classes enumerated in section 1 of Article IX of the Constitution, the Act is unconstitutional.

If the Act in question is not a tax exemption statute (which it clearly is), and if it should be regarded as a statute classifying property for purposes of taxation, it would still have to be adjudged unconstitutional as an arbitrary classification of property. In *Com. v. Alden Coal Co.,* 251 Pa. 134, 96 A. 246, this court declared the Act of June 27, 1913, P. L. 639, providing for the levying of a tax upon anthracite coal, void as violative of the uniformity clause of the Constitution (sec. 1, Article IX). In that case Justice STEWART, speaking for this court, said: "The legislature may not by arbitrary discrimination subject certain property to taxation, and exempt other property of the same kind and class and similarly situated from an equal burden.

. . . It is constantly to be borne in mind that the right of classification is allowed in order to avoid or correct inequalities, never to create them." The Act now challenged creates inequalities of tax burdens. A and B may own adjoining lands. If A cultivates flowers or wheat or strawberries on his land, he is taxed on its actual value, which may be $100 or more an acre. If B cultivates trees, he may, with the consent of the Secretary of Forests and Waters, escape all taxation on the land (until the distant date when the trees are harvested) except a nominal tax on a valuation of $1 an acre. What Justice PAXSON, speaking for this court, said in *Appeal of Fox and Wife,* 112 Pa. 337, 352, 4 A. 149, is applicable here: "This portion of the Constitution [the uniformity clause] is too important and valuable to be overridden by the legislature, or frittered away by judicial construction. It was intended to, and does, sweep away forever the power of the legislature to impose unequal burdens upon the people under the form of taxation. The evils which led up to its incorporation into the organic law are well known. The burden of maintaining the state has been, in repeated instances, lifted from the shoulders of favored classes and thrown upon the remainder of the community. This was done by means of favoritism and class legislation. Article IX of the constitution was intended to cut up this system by the roots, and we shall have no more of it if the legislative and judicial departments of the government perform their full duty in giving effect to that instrument."

In the report of *Cope's Est.* (supra), the argument of Richard C. Dale in that case is printed. While the tax discrimination he was condemning related to taxes on inheritances, what he said forty years ago applies equally as well to the instant case's discrimination in taxes on land: (p. 15) "A discrimination sanctioned in the matter of descent and succession will only be the forerunner of others, and the invidious distinction

between those more or less well to do will be accepted as a basis of all legislation; and instead of a commonwealth of freemen, having common rights and common duties, we shall have class arrayed against class, and each seeking to shift to the other the burdens and duties which should be carried by their united strength. I am no augur of evil, but if our people are to be thus divided, some juvenal of the twentieth century will have occasion to satirize the follies and vices of the populace of a decadent state,—demoralized and degraded by more insidious and injurious influences than panem et circences."

What Justice FIELD said in his concurring opinion in *Pollock v. Farmers' Loan & Trust Co.,* (supra), may appropriately be quoted here: "This inherent limitation upon the taxing power forbids the imposition of taxes which are unequal in their operation upon similar kinds of property. . . . If the court sanctions the power of discriminating taxation and nullifies the uniformity mandate of the Constitution, it will mark the hour when the sure decadence of our present government will commence."

Should we sustain the challenged Act, our decision would be far reaching in its effects. Not only would it be possible for great areas of land to be exempted from taxation under this Act, with the burden on other lands increased proportionally in order to make good the otherwise resulting deficiency in public revenues, but it is difficult to see how other tax exemption statutes could be struck down if this one is judicially sanctioned. No more dangerous power can be given to any government than the power to favor one class of taxpayers at the expense of another. In the autocratic governments now functioning in Europe we see this power exercised to the spoliation of millions of people. In *Loan Ass'n v. Topeka,* 87 U. S. 655, 664, the Supreme Court of the United States said: "To lay with one hand the power of the government on the property of the

citizen, and with the other to bestow it upon favored individuals . . . is none the less a robbery because it is done under the forms of law."

If this Act should be sustained, the legislature could enact laws whereby half or some other fraction of all the property in a county or township would have to bear the whole burden of governmental cost therein. This would give our state government unlimited power "to take from one individual and not from another, as it will."[1] By admitting large areas of land in a certain county or township into the class of "auxiliary forest reserves," the Secretary of Forests and Waters can cast the entire expense of government in that subdivision upon the owners of the remaining areas. The investiture of the government or any official thereof with this power is repugnant to our constitutional system and particularly to the sections cited, requiring uniformity of taxation and declaring void any attempted

---

[1] In "The Reconciliation of Government with Liberty" (1915), Professor John W. Burgess said of the Income Tax Amendment to the Federal Constitution (p. 371): "The 16th Amendment . . . has made over to the government the whole power of the sovereign . . . to take from one individual and not from another, as it will, and to take in different proportion from different individuals, as it will. This is not a power of constitutional taxation. It is the power of confiscation."

In discussing "the effect of a vast advance in governmental power and activity," Professor Burgess declared (p. 381): "A changing, shifting government, a government representing either the property class, or the propertyless class, especially a government representing the propertyless or small-property class, a government representing the modern democracy under universal suffrage, a government representing the class to be benefited by the confiscation and redistribution of wealth through governmental force, cannot be safely trusted with any such power [i. e., to "require sacrifices from one class to another"]. It would become a temporary despotism, which would destroy property, use up accumulated wealth, make enterprise impossible, discourage intelligence and thrift, encourage idleness and sloth, and pauperize and barbarize the whole people."

exemption from taxation of any property other than that specified. The property of this appellee is *not* within the exempted classes, and what the Superior Court said in *Christley v. Butler County* (supra), about the tree-and-forest-fostering Act of April 20, 1905, we now apply to the tree-and-forest-fostering Act of July 18, 1935: "Under the act . . . the owner of real estate may devote it to the purposes mentioned in the act and thus escape his share of the burden of taxation until he shall have raised a valuable lot of timber, which he may then proceed to sell and put [90 per cent of] the money received therefor in his pocket. We do not think the legislature has the power to thus aid an owner of real estate to raise timber for his personal profit."

The Commonwealth's policy of setting apart lands as forest reserves is a commendable one. The State has the power in the exercise of the right of eminent domain,[2] or by agreement with the owners, to acquire lands as such reserves. Doubtless large areas of such lands are available at comparatively small cost. When the title to such lands is acquired by the State, they become exempt from taxation as "public lands." But just because an owner devotes his land for a certain period of time to a use that promotes the public good, he does not thereby invest such land with the character of public lands. All lands which are properly utilized promote in some degree the public good but they cannot for that reason be wholly or partially exempted from taxation.

The question is also presented to us as to the right of the county commissioners to raise the question of the constitutionality of this statute. We hold that they do have this right. In *Donnelly's Est.*, 113 Pa. Superior Ct. 274, 173 A. 876, it was held that county commis-

---

[2] See *Com. ex rel., Appellant, v. Clearview Coal Co.*, 256 Pa. 328, 100 A. 820; *Jackman v. Rosenbaum Co.*, 263 Pa. 158, 167, 106 A. 238; and *Penna. Coal Co., v. Mahon*, 260 U. S. 393.

sioners may contest the constitutionality of an Act of Assembly which, if valid, takes away from them a source of taxes formerly given to them. It was said in that case, in the opinion of President Judge TRIMBLE of the Orphans' Court of Allegheny County (which opinion was adopted by the Superior Court); "The right of county commissioners to submit to the courts the constitutionality of the amending act is challenged without merit. Their duties are more than ministerial: Corpus Juris, Vol. 15, p. 456. . . . In *Com. v. Mathues*, 210 Pa. 372 [59 A. 961], . . . a state treasurer . . . was permitted to raise the question of the constitutionality of an act which required the payment of money from the State Treasury. In *Dupuy v. Johns*, 261 Pa. 40 [104 A. 565], the right was not denied." See also *Retirement Board v. McGovern*, 316 Pa. 161, 174 A. 400.

The decree is reversed at the cost of the appellee.