# Mahon et al., Appellants, *v.* Pennsylvania Coal Co.

*Constitutional law—Title of act—Statute—Act of May 27, 1921, P. L. 1198—Mines and mining—Surface support.*

1. The Act of May 27, 1921, P. L. 1198, entitled "An Act regulating the mining of anthracite coal; prescribing duties of certain municipal officers; and imposing penalties," sufficiently covers in its title the contents of its enactments.

*Constitutional law—Police power—Mines and mining—Surface support—Construction—Act of May 27, 1921, P. L. 1198—Private rights—Contracts.*

2. In determining whether an act is a reasonable piece of legislation within the police power, the courts may call to their aid all those external or historical facts which are necessary for that purpose and which led to the enactment of the statute.

3. In determining whether the Act of May 27, 1921, P. L. 1198, is a proper exercise of the police power, the courts may take into consideration the well established facts recited in the preamble of the act to the effect that the anthracite mining industry had been conducted in the State for many years so as to endanger life and property by the subsidence of the surface.

4. Where such a condition of facts exists it is primarily for the legislature to consider and decide on the facts of the danger, then meet it by a proper remedy.

5. In order to serve the public welfare, the State, under the police power, may lawfully impose such restrictions upon private rights as in the wisdom of the legislature may be deemed expedient, inasmuch as all property is held under the implied obligation that its use shall not be injurious to the community.

6. The mere fact of an exercise of the police power interfering with the use of property, will not render such exercise unconstitutional.

7. A statute enacted for the protection of public health, safety or morals can be set aside by the courts only when it plainly has no real or substantial relation to these subjects or is a palpable invasion of rights secured by the fundamental law.

8. The Act of May 27, 1921, P. L. 1198, which forbade such mining operations in the anthracite region as would cause the letting down of the surface under human habitations and certain other kinds of structures and grounds, is a proper and constitutional exercise of the police power.

9. The right of the State to assert legitimately the police power can never be limited by contract nor bartered away by the legislature.

10. A private owner of the surface who has granted the coal thereunder to another and waived the right of surface support, may, if his property is within the scope of the Act of May 27, 1921, maintain a bill in equity against the owner of the coal to prevent him from letting down the surface so as to injure or destroy a dwelling thereon.

11. As the Act of May 21, 1921, contains a provision for its enforcement by injunction, the fact that violations thereof constitute a misdemeanor, does not deprive the surface owner of a right to maintain a bill.

12. The fact that the owner of the surface has by his contract waived surface support, does not bar him against coming within the general rule that persons with a special interest may have public nuisances abated at their own suit.

13. It is not necessary, however, to depend upon the owner's special interest, for, under the act, he may be viewed as moving the court to enforce a general rule of public policy, intended for the protection of the whole community, rather than as acting simply for his own protection.

14. The State may authorize its citizens, individually, to assist in the enforcement of police regulations.

*Constitutional law—Local and special legislation—Classification —Population—Manifest peculiarities—Anthracite and bituminous coal mining—Act of May 27, 1921, P. L. 1198.*

15. The Act of May 27, 1921, P. L. 1198, is not unconstitutional as local or special legislation. The classification of lands by reason of their peculiarities and location is proper.

16. Laws enacted in pursuance of a necessity that springs from manifest peculiarities, distinguishing the persons, objects or localities legislated for, from other classes as to which the legislation in question would be useless or detrimental, are, properly speaking, neither local nor special,—they are general, because governing all persons, objects or localities similarly situated.

17. The courts will assume that the legislature in making a classification proceeded after a full examination and made the distinction on proper grounds.

18. A distinction between mining operations in the anthracite and bituminous regions is a sound one, and has always been recognized.

19. Conditions of population mentioned in the Act of 1921, form a proper ground of classification.

*Statutes—Construction—Preamble—Omission of preamble from printed laws—Act of June 3, 1911, P. L. 664.*

20. The Act of June 3, 1911, P. L. 664, directing that "no preamble......shall be printed when such bill becomes a law and is printed for general use," criticised.

21. Notwithstanding the Act of 1911, the courts will consider the preamble in construing the act, and passing upon its constitutionality.

. Argued April 17, 1922.   Appeal, No. 290, Jan. T., 1922, by plaintiffs, from decree of C. P. Luzerne Co., Oct. T., 1921, No. 11, dismissing bill in equity, in case of H. J. Mahon and Margaret Craig Mahon v. Pennsylvania Coal Co.   Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.   Reversed.

Bill in equity for injunction.   Before FULLER, P. J.
The opinion of the Supreme Court states the facts.
Bill dismissed.   Plaintiffs appealed.

*Error assigned,* among others, was decree, quoting it.

*W. L. Pace,* with him *H. J. Mahon,* for appellants.— What a sovereign state may do to protect those engaged on, or beneath the surface, as operatives of a coal mining company, from the dangers incident to its operations and their employment, it may also do to protect the lives and limbs, as well as property, of those not in the employ of said companies, while on the surface, as against the dangers incident to and connected with the manner of mining their coal and operating said coal mines: Holden v. Hardy, 169 U. S. 366; Plymouth Coal Co. v. Com., 232 U. S. 531; West River Bridge Co. v. Dix, 6 Howard 507; Nolan v. Jones, 263 Pa. 124; Com. v. Crowl, 245 Pa. 554; Jackman v. Rosenbaum Co., 263 Pa. 158; Hoffstos v. Voight, 146 Pa. 632; Com. v. Wormser, 260 Pa. 44; Mugler v. Kansas, 123 U. S. 623; Butchers' Union, etc., Co. v. Live Stock Co., 111 U. S. 746; Buffalo Mut. F. Corp. v. Breitinger, 250 Pa. 225; Schmid-

inger v. Chicago, 226 U. S. 578; Rosenthal v. New York, 226 U. S. 260; S. California Reduction Co. v. Sanitary Works, 199 U. S. 306; Wilkinsburg Boro. v. P. S. C., 72 Pa. Superior Ct. 423; Booth v. Illinois, 184 U. S. 425; Com. v. Vigliotti, 271 Pa. 10.

The Act of 1921 is not violative of the "impairment of the obligation of contract" clause in either the state or federal Constitution, nor does the act take private property without compensation contrary to law: Block v. Hirsch, 256 U. S. 135; Chicago, B. & Q. R. R. v. McGuire, 219 U. S. 549; McLean v. Arkansas, 211 U. S. 539; Atlantic Coast Line R. R. v. Goldsboro, 232 U. S. 548; West River Co. v. Dix, 6 How. 507; Fidelity Ins. T. & S. Dep. Co. v. Fridenberg, 175 Pa. 500; Penna. Hospital v. Phila., 245 U. S. 20; Leiper v. Baltimore, etc., Co., 262 Pa. 328; Bowman v. R. R., 125 U. S. 517; Northern Cent. Ry. v. Walworth, 193 Pa. 207; Durkin v. Coal Co., 171 Pa. 193.

The equal protection clause of the Fourteenth Amendment does not take away from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary: Ozan Lumber Co. v. Bank, 207 U. S. 251; Henderson Bridge Co. v. Henderson City, 173 U. S. 592; Com. v. Coal Co., 251 Pa. 134; Silver King Co. v. Mining Co., 255 U. S 144.

*Henry S. Drinker, Jr.,* with him *Reese H. Harris* and *Frank W. Wheaton,* for appellee.—The Act of 1921 impairs the obligation of the contract contained in the deed from defendant to Alexander Craig, plaintiffs' predecessor in title: Fletcher v. Peck, 6 Cranch 87; Adinolfi v. Hazlett, 242 Pa. 25; Graff Furnace Co. v. Coal Co., 244 Pa. 592; Scranton v. Phillips, 57 Pa. Superior Ct. 633; Edwards v. Kearzey, 96 U. S. 595; New Orleans Gas Co. v. Light Co., 115 U. S. 650; Charnetski v. Min-

ing Co., 270 Pa. 459; Madden v. Coal Co., 212 Pa. 63; Miles v. Coal Co., 217 Pa. 449; Raub v. Lackawanna Co., 60 Pa. Superior Ct. 462; Com. v. Coal Co., 256 Pa. 328.

The act is not a valid exercise of the police power: Nolan v. Jones, 263 Pa. 124; Lawton v. Steele, 152 U. S. 133; Dobbins v. Los Angeles, 195 U. S. 223; Chicago, M. & S. R. R. v. Wisconsin, 238 U. S. 491; Householder v. Coal Co., 272 Pa. 78.

The act shows on its face that its purpose is not to protect the lives or safety of the public generally but merely to augment the property rights of a favored few: Com. v. Coal Co., 256 Pa. 328; Poland Coal Co.'s Case, 58 Pa. Superior Ct. 312; Phila. Clay Co. v. Clay Co., 241 Pa. 305; Jacobs v. Water Supply Co., 220 Pa. 388.

The act is unconstitutional because it is local, special class legislation and deprives those affected by it of the equal protection of the laws: Ayars's App., 122 Pa. 266; Com. ex rel. v. Schumaker, 255 Pa. 67; Com. v. Coal Co., 251 Pa. 159; Chalmers v. Phila., 250 Pa. 251.

The act is unconstitutional because the title does not clearly express the subject-matter of the act: Phila. Clay Co. v. Clay Co., 241 Pa. 305; Com. v. Kebort, 212 Pa. 289.

*George E. Alter,* Attorney General, and *George Ross Hull,* Deputy Attorney General, for the Commonwealth.

*Owen J. Roberts,* with him *Philip V. Mattes* and *Frank M. Walsh,* for appellee: Scranton Surface Protective Association.

*C. La Rue Munson* and *Edgar Munson,* for Scranton Gas & Water Co.

*Philip V. Mattes,* City Solicitor, for City of Scranton.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, June 24, 1922:

This is an appeal from a decree dismissing a bill in equity; plaintiffs, man and wife, asked that defendant, a

Pennsylvania corporation, be restrained from mining any coal underlying the former's property in the City of Pittston, "the removal of which will cause the caving-in, collapse or subsidence of their dwelling house," contrary to the Act of May 27, 1921, P. L. 1198, commonly known as the Kohler Act.

At the outset, it may be stated that, so far as the contractual rights of the respective parties are concerned, as shown by the paper title to the properties involved, defendant is expressly authorized to mine the subjacent strata owned by it without any obligation to support the surface owned by plaintiffs.

The court below found that, "if not restrained, defendant.....will.....cause the caving-in, collapse and subsidence of the surface, together with the dwelling, entailing injury upon plaintiffs"; but refused an injunction, on the ground that "the owner of the coal has an absolute right to remove the whole of the same, free from all liability for injury thereby inflicted," and "no interest is involved......except the private interests of the plaintiffs in the prevention of a private injury."

The position assumed by the learned court below raises, as the sole question for consideration, the applicability of the Kohler Act to the facts of this particular case; but the discussion of counsel, representing the parties to the cause and those who were allowed to intervene at argument, including the city solicitor and the attorney general of the State, has taken a much wider range, and calls for consideration, first of all, of the constitutionality of the act itself, as a reasonable and valid exercise of the police power.

The statute is entitled: "An act regulating the mining of anthracite coal; prescribing duties for certain municipal officers; and imposing penalties." This title is sufficient to cover the contents of the enactment.

Section 1 provides that it shall be unlawful "so to conduct the operation of mining anthracite coal as to cause

the caving-in, collapse, or subsidence of (a) Any public building or any structure customarily used by the public as a place of resort, assemblage, or amusement, including, but not being limited to, churches, schools, hospitals, theatres, hotels, and railroad stations; (b) Any street, road, bridge, or other public passageway, dedicated to public use or habitually used by the public; (c) Any track, roadbed, right-of-way, pipe, conduit, wire, or other facility, used in the service of the public by any municipal corporation or public service company as defined by the Public Service Company Law; (d) Any dwelling or other structure used as a human habitation, or any factory, store, or other industrial or mercantile establishment in which human labor is employed; (e) Any cemetery or public burial ground."

Sections 2 to 5, inclusive, place certain duties on public officials and persons in charge of mining operations, to facilitate carrying out the purposes of the act.

Section 6 provides the act "shall not apply to [mines in] townships of the second class [i. e., townships having a population of less than 300 persons to a square mile], nor shall it apply to any area wherein the surface overlying the mine or mining operation is wild or unseated land, nor where such surface is owned by the owner or operator of the underlying coal and is distant more than one hundred and fifty feet from any improved property belonging to any other person."

Section 7 sets forth penalties; and section 8 reads: "The courts of common pleas shall have power to award injunctions to restrain violations of this act."

The remaining sections state: when the statute takes effect; that inconsistent legislation is repealed; that "This act is intended as remedial legislation, designed to cure existing evils and abuses, and each and every provision is intended to receive a liberal construction such as will best effectuate that purpose"; and that all provisions "are severable one from another."

In determining whether the act is reasonable legislation within the police power, we may "call to our aid all those external or historical facts which are necessary for this purpose and which led to the enactment": Endlich, Interp. of Stats., s. 29.'

The anthracite coal field of Pennsylvania comprises a large area, on the surface of which have grown up, and now exist, many cities, boroughs and villages, containing a population of approximately a million persons.   When this district was sparsely peopled, the caving-in of the surface was not of public moment; but, within the past fifteen or twenty years, it has become a matter of widespread notoriety that these disturbances menace the safety and material welfare of the inhabitants of communities in that part of the State.   During the period mentioned, the facts have been put before the public, not only by news of the collapse of streets and the fall of buildings, but also through the reports of commissions created by joint resolutions of the legislature and by means of numerous proposed statutes, antedating the present law, introduced into that body, some of which passed and others did not; likewise, by messages from the governor of the Commonwealth addressed to the general assembly.

The conditions that gave rise to the act are summarized in a preamble thus: "Whereas, the anthracite coal industry in this Commonwealth has been and is being carried on in populous communities in such a manner as to remove the entire support of the surface of the soil to such an extent as to result in wrecked and dangerous streets and highways, collapsed public buildings, churches, schools, factories, streets, and private dwellings, broken gas, water and sewer systems, the loss of human life, and in general so as to threaten and seriously endanger the lives and safety of large numbers of the people of the Commonwealth; therefore be it enacted," etc.

In signing the bill, the governor stated of record that "lives have been lost, homes, churches and schools destroyed, and an ever-present peril has threatened the morale of the entire community"; adding, "for a generation, the appeal......to save the situation has been heard at the capital."

It is not denied on the present record that the conditions above described exist; and the legislature having declared in terms what, in a general way, had become a matter of public notoriety, we must accept such declaration as a correct statement of facts: People ex rel. Durham Realty Corp. v. La Fetra, 230 N. Y. 429, 440; Lower Vein Coal Co. v. Industrial Bd., 255 U. S. 144, 148; Block v. Hirsh, 256 U. S. 135, 154; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 198.

That the conditions portrayed in the legislative declaration are such as to create an emergency, properly warranting the exercise of the police power, is sufficiently obvious not to call for extended discussion. It is primarily for the legislature to consider and decide on the fact of a danger, then meet it by a proper remedy: Stafford v. Wallace, 42 U. S. Supreme Ct. Rep. (issue of June 9, 1922), 397, 401.

Of course, the cure must always bear a substantial relation to the existing evil, and must not constitute a mere attack on property rights, disguised as an exercise of the police power. In judging of this, however, it is to be remembered that "in order to serve the public welfare, the State, under its police power, may lawfully impose such restrictions upon private rights as, in the wisdom of the legislature, may be deemed expedient; for all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community......[and] a statute enacted for the protection of public health, safety or morals can be set aside by the courts only when it plainly has no real or substantial relation to these subjects or is a

palpable invasion of rights secured by the fundamental law; if it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination is conclusive": Nolan v. Jones, 263 Pa. 124, 127-8, and authorities there cited.

It has often been decided of recent years that the mere fact of an exercise of the police power interfering with the use of property will not render such exercise unconstitutional. A host of authorities on this point might be cited, but it is not necessary to go beyond our own recent cases. In Nolan v. Jones, supra, at page 131, discussing another case (Com. v. Charity Hospital, 198 Pa. 270, 277) that dealt with an act which prevented a hospital from erecting additional buildings on real estate owned by it, we said that such deprivation was not a violation of the Fourteenth Amendment, and did not take from the complainant its property without due process of law, adding, "It is true the act does prevent the [hospital] from using its property in a manner which before was lawful, but [since] . . . . . . the act in question is . . . . . . a valid police regulation . . . . . . defendant has no cause of complaint." This last mentioned principle applies here, for the statute before us is a police measure which does not, in any true legal sense, contemplate the taking of private property for public use (Com. v. Plymouth Coal Co., 232 Pa. 141, 149), or the transferring of it from one person to another: Jackman v. Rosenbaum Co., 263 Pa. 158, 167-70, and authorities there cited. In fact, the prayers of the present bill suggest no such intention; they are, first, as quoted at the head of this opinion; second, that defendant be restrained from "so conducting its mining operations as to cause the caving-in, collapse or subsidence of plaintiff's dwelling"; and, third, for general relief—in other words, for such incidental interference with defendant's property rights, and such only,

as may be necessary in order to carry out the declared public policy of the State.

Incidental interference with property rights, by legislation regulating the mining of coal, is by no means new to Pennsylvania; such interferences have invariably been upheld as proper exercise of the police power: see Com. v. Plymouth Coal Co., 232 Pa. 141, and cases there cited, affirmed by the Federal Supreme Court in Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531.

True, in Com. v. Clearview Coal Co., 256 Pa. 328, 330-1, we ruled, on the law as it then stood, that a defendant, possessed of the contractual right to let down the surface, would not be "restrained from mining coal under a school building, to the injury thereof," at the suit of one who held title to the surface subject to that right, saying, inter alia, "it is difficult to understand how the doing of a lawful act in a lawful manner can constitute such a public nuisance as will be restrained in equity"; but "circumstances may so change in time . . . . . . as to clothe with [a public] interest what at other times . . . . . . would be a matter of purely private concern" (Block v. Hirsh, 256 U. S. 135, 155), and, since the date of the Clearfield decision, the Kohler Act has been passed, declaring, in effect, mining such as threatened by the present defendant to be a public nuisance.

It always has been the law of Pennsylvania that the surface owner was entitled to support unless he released or waived his right, but when he did so, he would be held to his contract; the law, as thus developed, was pronounced and acted upon in the Clearfield case. After that pronouncement, however, the general assembly,—taking cognizance of the change in conditions wrought by time and new methods of mining, and of the increasing public harm worked by the rule theretofore adhered to,—altered the law in so far as it applied to certain presumably thickly populated areas in the hard-coal district, forbidding such mining operations as would cause the letting down of the surface under, inter alia, "any

dwelling or other structure used as a human habitation,"
and providing for restraint by injunction.  Thus the
law in the Clearfield case, so far as it might apply to the
facts at bar, is effectually overruled by those who have
the right to declare the public policy of the State; and
this legislative pronouncement, as also the means pro-
vided to carry it into effect, is binding on us, unless a
palpable abuse of power appears, or unless it can be dem-
onstrated that the statutory relief thus provided is
plainly forbidden by the organic law.

We said, in Pennsylvania R. R. Co. v. Ewing, 241 Pa.
581, 589, "The scope of judicial inquiry in deciding ques-
tions of power is not to be confused with the scope of
legislative considerations in dealing with matters of
policy; whether an enactment is wise or not, whether
it is based on sound economic theory, whether it is the
best means to achieve the desired result, whether, in
short, the legislative discretion within its prescribed
limits should be exercised in a particular manner, are
matters for the judgment of the legislature, and the
earnest conflict of serious opinion does not suffice to
bring them within the range of judicial cognizance,"
citing Chicago, etc., R. R. Co. v. McGuire, 219 U. S. 549.

The Federal Supreme Court, dealing with the general
subject in hand, said in Lawton v. Steele, 152 U. S. 133,
140: "While the legislature has no right arbitrarily to
declare that to be a nuisance which is clearly not so, a
good deal must be left to its discretion in this regard,
and, if the object to be accomplished is conducive to the
public interests, it may exercise a large liberty of choice
in the means employed"; see also Shelby v. Cleveland
Power Co., 155 N. C. 196, 201; Village of Atwood v.
Otter, 296 Ill. 70, 81, 129 N. E. 573, 577.

In view of the facts which gave rise to the act now be-
fore us, we cannot say the questions involved were not for
legislative decision; nor can it be held, under the au-
thorities, that the contractual right of defendant to let
down the surface is rendered dominant by the various

constitutional provisions depended on by appellee (Bowman v. Chicago Ry. Co., 125 U. S. 465, 517; Chicago, etc., R. R. Co. v. McGuire, 219 U. S. 549, 569; McLean v. Arkansas, 211 U. S. 539, 547; Atlantic C. L. R. R. Co. v. Goldsboro, 232 U. S. 548, 558; Levy Leasing Co. v. Siegel, 42 Supreme Ct. R. 289, 292, issue of April 15, 1922, and cases there cited); particularly is this so when we consider the mandate of our Constitution (article XVI, section 3) that "the exercise of the police power of the State shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the......general wellbeing of the State": Scranton v. P. S. C., 268 Pa. 192, 195.

The police power, "legitimately exercised, can never be limited by contract nor bartered away by the legislature" (Holden v. Hardy, 169 U. S. 386, 392; see also N. Pacific Ry. Co. v. Minn, 208 U. S. 583, 596, 597); and this court, in dealing with the police power has repeatedly held that private contracts cannot interfere with its legitimate exercise by the State; the theory being that all contracts raising rights or imposing obligations, the exercise of which may affect the public welfare, are, of necessity, made subject to the reserved right of the State to modify them by legitimate assertion of the police power: Leiper v. B. & P. R. R. Co., 262 Pa. 328, 332; Scranton v. P. S. C., 268 Pa. 192, 197-8.

It was the harmful results, to the community as a whole, of contracts granting the right to let down the surface under any and all circumstances, that gave rise to the statute now attacked; and the power to enforce the public policy of the State, declared in this legislation, cannot be defeated because those who move the court (plaintiffs at bar) are parties to such a contract.

The legal right of these individual plaintiffs to proceed in equity is not questioned in the pleadings, and no one, directly or indirectly involved in the present suit, raises any point against such right; but, since it is a

matter of public importance, the court itself asked that printed arguments be submitted thereon. After reading the various briefs prepared by learned counsel, we are convinced there is nothing in the law to prevent plaintiffs from prosecuting these proceedings; as we shall now show.

First, since the statute itself contains a provision for its enforcement by injunction, the fact that violations thereof constitute a misdemeanor, is of no moment. Next, we have already held, supra, that the fact of plaintiffs' contract, granting defendant a right to let down the surface of the land in question, cannot interfere with the enforcement of the declared public policy of the State; hence appellants' peculiar special interest,—affected, as it is, by a waiver of surface support which antedates the legislative declaration of public policy,—constitutes no bar against their coming within the general rule that persons with a special interest may have public nuisances abated at their own suit: as to the right of persons with a special interest to such relief, see Klein v. Livingston Club, 177 Pa. 224, and cases there cited; and, for relevant authorities from other jurisdictions, see Kaufman v. Stein, 138 Ind. 49; People's Gas Co. v. Tyner, 131 Ind. 277; Cranford v. Tyrrell, 128 N. Y. 341; Joos v. Illinois Nat. Guard, 257 Ill. 138; also a statement of the general rule in 20 R. C. L. 476, s. 90. It is not necessary to depend  upon  plaintiff's  special  interest,  however,  for, under the Kohler Act, they may be viewed as moving the court to enforce a general rule of public policy, intended for the protection of the whole community, rather than as acting simply for their own protection. As said in Com. v. Plymouth Coal Co., 232 Pa. 141, 146, quoting from and citing other authorities: "The whole is no greater than the sum of all its parts, and when individual......safety and welfare are sacrificed, the State must suffer." Every habitation thrown to the ground in the course of the operations of a vast industry,—the manner of conducting which has caused many such oc-

currences,—with the dangers to human life and other direful possibilities that attend these happenings, can well be considered as part of a general harm, against which the legislature, exercising the police power of the State, may properly provide.  Finally, the authorities indicate that it is competent for the legislature to vest a civil remedy in any citizen, irrespective of his special interest, to enforce a declaration of public policy, and this the present act does in effect.  The principle involved is thus stated in Littleton v. Fritz, 65 Iowa 488, 496 : "There can be no doubt it is within the power of the legislature to designate the person or class of persons who may maintain actions to restrain a public nuisance, and, when that is done, the action is, for all purposes, an action instituted in behalf of the public, the same as though brought by the attorney general or public prosecutor."   In this connection, our own case of Craig v. Kline, 65 Pa. 399, 410, 412, shows the State may authorize its citizens, individually, to assist in the enforcement of police regulations, albeit no property interest of the particular plaintiff has been specially affected by the violation complained of.   Though plaintiffs' right to institute the present suit cannot be opposed successfully, yet the act of assembly itself is attacked on other grounds, which call for consideration.

Appellee stigmatizes the act as local and special legislation, forbidden by the Constitution.  The facts that the statute is inapplicable to bituminous coal mines, to operations located in townships having a population of less than 300 to the square mile, and to "any area wherein the surface overlying the......operation is wild or unseated land," or "where such surface is owned by the owner or operator of underlying coal and is distant more than 150 feet from any improved property belonging to any other person," do not, on the grounds of local or special legislation, constitute it a violation of the organic law of Pennsylvania; proper classification is permissible, and the act before us is in that category.

Laws enacted in pursuance of a necessity that springs from manifest peculiarities, distinguishing the persons, objects or localities legislated for, from other classes as to which the legislation in question would be useless and detrimental, are, properly speaking, neither local nor special,—they are general, because governing all persons, objects or localities similarly situated (Ayars's App., 122 Pa. 266, 281; Com. v. Gilligan, 195 Pa. 504, 510); such grouping is permissible and cannot be set aside by the courts for that reason.

"Classification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified": Seabolt v. Commissioners, 187 Pa. 318, 323. Here the distinctions are real and fully warrant the classifications in hand.

To begin with, the fact that the present act distinguishes coal mining from other sorts of mining cannot prevail against the validity of the statute in the absence of some warrant for holding the resulting classification to be without reason; for, nothing appearing to the contrary, it is "assumed the legislature proceeded after full examination" and made the distinction on proper grounds: Nolan v. Jones, 263 Pa. 124, 128, and cases there cited. Next, the distinction between mining operations in the anthracite and in the bituminous coal fields has been constantly and consistently recognized in our law, both by the courts and the legislature, for many years, and is now well established: see Act March 3, 1870, P. L. 3, construed in Williams v. Bonnell, 8 Phila. 534; Act June 2, 1891, P. L. 176, construed in Durkin v. Kingston Coal Co., 171 Pa. 193; Act May 15, 1893, P. L. 52, construed in Com. v. Jones, 4 Pa. Superior Ct. 362; see also Com. v. Grossman, 248 Pa. 11, 18; Com. v. Alden Coal Co., 251 Pa. 134, 139. Lastly, the other distinctions, before mentioned, are all founded on differences arising from the fact of density, or lack of density, of population; and such circumstances have repeatedly

been considered as constituting a sound basis of classification.

In connection with the statement just made,—that conditions of population form a proper ground of classification,—see, for example, Com. v. Charity Hospital, 198 Pa. 270, 276-7, 283, where an act prohibiting the "establishing or maintaining of additional hospitals, pest houses or burial grounds, *in built-up portions of cities,*" was attacked as local or special legislation. In sustaining the act, the court below said: "There is obviously much greater danger to the general public health from [hospitals, etc.] in a populous city than in the country, or in a village, and the danger will be in proportion to the number and density of the population......; when, therefore, a statute prohibits hospitals, etc., in the built-up portions of cities it thereby draws a line, having the populous centers on one side and the less populous on the other, in a case where the supposed evil does or does not exist, according to the greater or less density of population." We adopted this reasoning, per curiam. The Anthracite Mining Act of June 2, 1891, P. L. 176, applies solely to mines of that character, located in certain parts of designated counties, employing a working force of "more than ten persons"; it was sustained in Durkin v. Kingston Coal Co., 171 Pa. 193, 204. Again, party wall legislation is applicable to "congested districts" alone: Jackman v. Rosenbaum, 263 Pa. 158, 173. On the general subject of classification according to population, Wheeler v. Phila., 77 Pa. 338, and Beltz v. Pittsburgh, 26 Pa. Superior Ct. 66, may be cited.

The act before us expressly recognizes the evident fact that conditions attendant upon mining operations in densely populated communities differ greatly from, and, so far as surface support goes, are more dangerous than those in sparsely settled or uninhabited districts; this difference warrants the classification here involved: Com. v. Hanley, 15 Pa. Superior Ct. 271; Beltz v. Pitts-

burgh, 26 Pa. Superior Ct. 66. Had the distinction based upon density of population not been adopted, and had the legislation been made to apply to mines in sparsely settled townships, then, since every exercise of the police power must be reasonable, appellees might, perhaps, have argued with some force that it was useless and detrimental to carry out the provisions of the statute in localities where both common sense and common consent would declare no necessity or danger existed; thus the argument against the classification adopted seems to defeat itself.

In Ruan Street, 132 Pa. 257, 276, this court said: "Among the many subjects of legislation which classification presents [are]......the preservation of the public health, protection against fire," etc.; and to this statement, of course, may be added, "the preservation of the public safety." The whole structure of the present act manifestly rests on that basis, and its justification is reinforced by the previously quoted preamble.

While on the subject of the preamble, it may be well to note that, although this part of the bill does not appear at the head of the statute in the published volume of laws for the year in question, the legislative records show it was passed and then eliminated in the printing of the law, under the Act of June 3, 1911, P. L. 664, which, very unwisely, we think, directs that "No preamble......shall be printed when such bill becomes a law and is printed for general use."

The objection that sections 4 and 5 of the act offend against the provision of our Constitution which forbids local or special legislation "prescribing the powers and duties of officers in cities, boroughs and townships," need not be considered, since no question arising thereunder is properly before us.

Upwards of 200 authorities have been submitted for our consideration. We have studied all with which we were not already familiar, and cited a number which seem relevant, some with discussion; other, omitted, may

be as appropriate as those mentioned, but a proper regard for the length of this opinion forbids their use. Of course, many of the authorities noted comprehend rulings on a state of facts essentially different from those now before us; but, in such instances, the opinions will be found to contain either illustrative discussions or statements of appropriate general principles, and the cases are used for that reason, not necessarily in approval of rulings they may happen to include. Finally, we need not discuss further the authorities depended on by appellee; it is sufficient to say that none of them controls the present case.

The order appealed from is reversed and the bill reinstated; the record is remitted, and the court below is directed to enter a decree in accord with the views expressed in this opinion; appellee to pay the costs.

DISSENTING OPINION BY MR. JUSTICE KEPHART:

While there are many cases of property damage due to subsidences, and people located thereabouts have been permitted to suffer because of what was then, and is now declared to be, a mistaken idea as to the power of an individual to sell property without surface support, yet that was the Commonwealth's blunder, and the Commonwealth should pay for its mistakes from general funds or use for this purpose the money now to be received from taxes on this very coal. No great hardship would follow that action; this, indeed, was the solution of this problem reached by the Constitutional Revision Commission of 1920; an amendment was proposed which, in express words, permitted the legislature to tax only for the purpose of affording compensation to surface owners. Instead of adopting such remedy, the legislature passed two bills known as the Kohler and Fowler Bills, only the first of which is here for consideration. But, in this case, we cause the party, who has paid, to pay again, and still again when some legislature thinks an additional charge advisable.

The majority opinion is a long stride in the development of the law of police power. It broadens its hitherto known scope, makes it applicable to subjects never contemplated by the framers of the Constitution, subordinates all other constitutional guarantees in apparent conflict, and the exercise of this power becomes nothing more than the will of the legislature, without being subject to judicial investigation. This may be a proper conception of the science of government, but I think the Constitution of this State and of the United States would not have been adopted had the participants expected such results. The logical result of the majority opinion will go far to bring about the condition so earnestly longed for by those advocating equalization of property. Constitutional mandates and protections are swept aside and the legislature is supreme, while acting within any pretended scope of this power, so long as the statute, in a preamble, asserts: "this is for the public good." Police power becomes the open door to govern or rule, for, through it, property may be transferred by the legislature from one person to another without compensation; the limitation of power to so act was heretofore one of the chief obstacles in the way of those favoring this socialistic principle.

It will thus be seen how vital the litigation is, not only with respect to the particular subject-matter involved, but also as to all other holdings by individuals; it is impressively far-reaching, as it legalizes the division of property plan, a socalistic idea that may yet be the law. It is a short step from coal, thus transferred to other forms of property, as money, lands and buildings. The legislation on which this suit is grounded covers property estimated not in tens but hundreds of millions of dollars, and reaches a commodity absolutely essential to our preservation. The lives of the people are dependent on an adequate supply of coal. If the majority view is to be sustained, and its opinion given its logical place, the law not only adversely affects the pro-

curement of this commodity, but might ultimately deprive many people of its use.

Since Jones v. Wagner, 66 Pa. 429, 435, decided in 1870, followed by Scranton v. Phillips, 94 Pa. 15, 22, and a long line of cases thereafter, this court has recognized the absolute right to acquire, possess and protect property, including the right to make a reasonable contract in relation thereto; the right to create different estates in land, selling the sub-stratum, releasing the right to have the superincumbent estates supported or releasing the right of surface support; the right to mine all the minerals, even though it should result in the surface falling in. This court has said such contracts are non contra bonos mores, not prejudicial to general welfare and public policy,—that they should be recognized, and that all persons competent to contract should have the utmost liberty to do so. Based on these opinions (Adinolfi v. Hazlett, 242 Pa. 25, 27; Waters v. Wolf, 162 Pa. 153, 170; Godcharles v. Wigeman, 113 Pa. 431, 437; Graff Furnace Co. v. Scranton Coal Co., 244 Pa. 592, 596), constantly reaffirmed within the last fifty years, we have not only placed the seal of approval on such contracts, but have written our decisions into them.

In Com. ex rel. v. Clearview Coal Co., 256 Pa. 328, under similar facts, this court refused to enjoin a failure to support a public school building or removal of coal thereunder. We there held that to grant the relief asked "practically takes such coal (as was necessary to support the surface) from defendant and vests it in the school district," which "would, in fact, be taking of private property for public use without compensation, which the Constitution forbids." Further, in Penman v. Jones, 256 Pa. 416, recently affirmed in Charnetski v. Coal Mining Co., 270 Pa. 459, we have recognized in this State three distinct estates in mining properties; (1) the surface, (2) the underlying coal, and (3) the so-called third estate, or right to have the surface supported by the underlying strata. This latter estate may be in the sur-

face owner, giving full right of support, or in the coal owner, giving absolute power to mine without interference, or, in a third condition, not material for our present consideration. In the case at bar, this third estate had vested, by virtue of a valid contract between the owner of the surface and the owner of the coal, in the latter. The Kohler Act takes this property-right from defendant and vests it in plaintiff without compensation. This act does more than merely restrict defendant in the use of property; it transfers an independent property right to plaintiffs, vesting the permanent use and perpetual enjoyment of this right in one who is not required to pay anything for what he so acquires, and which he may sell in selling his surface, with the increased value given it by this legislation added.

We have, by the foregoing decisions, encouraged our citizens, and others throughout the nation, to invest millions in these enterprises, until we have here developed the great anthracite industry, peculiar to Pennsylvania, and to but few counties in the State. The legislature stood by during all this time, watched the growth of this enterprise, noted the subsidences, and did nothing. When this great anthracite industry reached its most flourishing state of prosperity, the legislature, for reasons hereinafter stated, passed an act that nullifies the contracts under which a great extent of territory was procured; contracts solemnly made on the faith of the word of the highest court of this State are swept aside, rights summarily destroyed, and property transferred to individuals without compensation.

Plaintiffs' predecessor in title, or, for the purposes of this case, these plaintiffs, together with the many others who purchased similar surface lots in the anthracite region, paid much less for the property purchased because they were willing to acquire it without the right of support, even though the surface fell in. Still others sold the coal beneath their lots, giving the grantee the full right to mine it without any duty to support the

surface, securing a better price for their bargain than if they had retained support.  The first class could have stipulated for support, and the second could have retained it, and the coal owner would have been required to leave standing in pillars from one-fourth to one-third of the coal; but they did not see fit to do so.  It now happens they, and others like them, are dissatisfied and have induced the legislature to pass this act, known as the Kohler Act, which forbids mining this same coal from under this same lot without leaving sufficient surface support,—that is, requiring, for all practical purposes, from one-fourth to one-third of the coal to remain in place.  The act gives free of charge to all these surface owners that which they have already been paid for,—all this, under the police power.  But, mark the deception of those who wrote the act.  At the same session of the legislature, that body, by another act, permits the same coal owner to take out the same coal, provided he pays a certain percentage of the market tonnage price of the coal to a state coal commission; this to be used to reimburse these same plaintiffs for the same rights already paid for.  The majority opinion does not discuss the second act, known as the Fowler Act: May 27, 1921, P. L. 1192.

Under the latter act, this commission collects two per cent of the market price of coal mined during the year.  During the years 1920 and 1921 ninety million tons of anthracite coal were mined each year, of a market price of approximately $6 a ton, netting the commission and the surface property holders from ten to eleven million dollars per annum, when the acts are in operation.  This defendant, who is now enjoined, can go to that commission, under the Fowler Act, pay two per cent on all his tonnage, and procure the privilege of mining this same coal.

Both acts comprehend all coal companies engaged in the anthracite business; while second class townships are eliminated from the Kohler Act, they are very few,

the majority being first class; but as the majority of coal operations center in some place covered by the act, practically all hard coal operators are included. The price paid is two per cent on all tonnage, no matter where mined or how long the mining continues; he pays, as long as mining continues, on all tonnage for the privilege of taking out coal under any single habitation. Payment to the commission is not restricted to coal taken from under that lot or building, nor does it matter how deep the coal or how unlikely subsidence would affect the surface. The Kohler Act clearly impairs the obligation of contract, inhibited by section 10 of article I of the federal Constitution, and section 17 of article I of our Constitution. See New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 671, 672; Russell v. Sebastian, 233 U. S. 195, 204.

The police power, in the Kohler Act, is supposedly invoked as a protection to life, property and safety; but under this act, these terms are meaningless. If the legislature had desired to protect life and limb it could have required a notice, given sufficient time in advance, from the operator to the surface owner, when mining was to be done under his or her land, where the right of surface support had been released or conveyed away. Severe penalties could be attached for failure to give the notice in time if mining was proceeded with. It will thus be seen that, regardless of anything else that may be in the act with respect to these purposes, the end does not justify the means, and it is evident, from both acts, the real purpose of the legislature and the framers of the act was in the interest of property, and property alone,—not to prevent the "terrible menace to human life, public safety and morals."

Nor can we conceive this a proper exercise of police power. The rent cases, recently decided by the United States Supreme Court, do not support the Kohler Act. If the laws there sustained had been effective for all time to come, and if, instead of providing expressly for fair

compensation, they had denied all compensation, I feel sure the Supreme Court would have held them unconstitutional, even though emergency laws, passed to meet an overpowering necessity.  My view of the rent cases is that the war brought on a crisis, presenting a condition wherein landlords generally, through excessive charges, so disturbed the peace and security of the people that states were compelled to regulate the business by limiting them to a fair return.  There was no thought or attempt to take landlords' property, or their use of it, without just compensation.  Such laws were to continue only so long as the crisis brought on by the war existed.  This failure to provide compensation, in the Kohler Act, brands it as unconstitutional.

The recent decisions by the United States Supreme Court in the Child Labor cases are more applicable; they indicate the duty of the courts to curb attempts by the legislative branch to assume to itself powers denied it by the Constitution, notwithstanding the effort to cover the true nature of the power exercised by a preamble or other provision ostensibly bringing it under another recognized power.

The legislative declaration that a given use is a public one does not conclusively determine the question; it is for the courts to decide whether or not a statute is a legal exercise of the police power.  They are not bound by the form of the act, but will look into the substance of things: Nolan v. Jones, 263 Pa. 124, 128; Dobbins v. Los Angeles, 195 U. S. 223, 236; Mutual Film Corp. v. Industrial Commission of Ohio, 236 U. S. 230; C., M. & St. P. R. R. Co. v. Wisconsin, 238 U. S. 491, 500.  Here are plaintiffs asserting, for their own benefit as a public use, an act which, in its application, is purely personal to them.  The Barrier Pillar Case (Com. v. Plymouth Coal Co., 232 Pa. 141; 232 U. S. 531) is, to my mind, clearly distinguishable.  The requirement that the adjoining mine owners leave pillars along their respective boundaries had an obvious and necessary relation to the

life and safety of their employees, which could be secured in no more reasonable way. It did not constitute a permanent deprivation of property or transfer its use in perpetuity to another, the restriction imposed being but temporary or incidental. Furthermore, each owner there received a reciprocal benefit, commensurate with the burden imposed, in the protection of his own mine from water in that adjoining. One party was not, as in the Kohler Act, made to suffer all the burden for the benefit of another.

We have already observed these acts show on their face their intention was not to protect lives or safety generally, but merely to augment property rights of the few; the public generally, as distinguished from this particular class, is not interested, but they are vitally interested in the continued production of this commodity, which is here unduly interfered with, to their prejudice. So we have, by the majority opinion, the police power overriding the constitutional provision as to (a) the obligation of contracts, and (b) a taking of property without compensation. The attempt of the legislature, in passing these two acts,—the one an effort to exercise presumptively a valid police power, and the other sweeping aside whatever good intent was in the first,—was a mere subterfuge to create the Kohler law a valid act under this power.

We have held defendant's right to the subjacent mineral was as absolute as it was possible to make it, such strata being expressly relieved from the duty of supporting the surface; and we decided negligent mining would not impose liability where the right of surface support was released: Jordan v. Clearview Coal Co., 270 Pa. 216; Charnetski v. Miners Mills Coal Co., 270 Pa. 459, 463; Atherton v. Clearview Coal Co., 267 Pa. 425, 434. The legislature may have been neglectful in not sooner declaring it against public policy for surface owners to release their right of support and in prohibit-

ing such contracts for the future, but it had no power to nullify them for the past.

We now hold negligent mining constitutes a good cause of action, that our declaration "non contra bonos mores and for the general welfare" is all wrong, as is also our judicial judgment as to what constitutes general welfare, applied to an act of assembly. Our judgment yields to the legislature's definition of general welfare, and our right to judicially determine this, as applied to a police power act, falls. But, more important, *the right of surface support is reëstablished where it has been released,* and this affects bituminous coal fields as well, for how can we have running parallel a legislature-declared general welfare as to anthracite fields and a court-declared general welfare as to bituminous fields treating the identical subject-matter,—subsidence,—in opposition to each other, where the two rights and the danger to life and safety incident to them are precisely alike?

Moreover, this is class legislation,—a subsidence is a subsidence, whatever the underlying strata may happen to be: whether it is bituminous coal, anthracite coal, fire clay or any other mineral; this act affects only anthracite coal.

It is said that there are a million people living in this region. That may be true, but the majority opinion does not mean to assert that anything near that number, or, at the most, more than a very small fraction, is affected by these subsidences, which have been confined practically to a small part of Scranton; they ought to be taken care of, notwithstanding the legislature permitted conditions to exist whereby the surface could be let down and properties destroyed. But these owners knew what they were paying for,—put up their buildings notwithstanding this knowledge,—taking chances. But if the first declaration as to the right to release surface support was wrong, the State should pay; the people are responsible for this condition.

Our decisions covering public service laws do not apply, for it was distinctly stated that, where a business was recognized as lawful and not against public welfare, and the statute controls only its method and administration, such control is not affected so as to work confiscation or a destruction of property; in all cases of regulation, the courts inquire whether property has been taken without due process of law, or contract rights violated. So we have held that contracts are not interfered with or impaired by such laws, where compensation is reduced. See Suburban Water Co. v. Oakmont Boro., 268 Pa. 243, 253.

But we have never before upheld a statute that confiscates property; nor does the case of Nolan v. Jones, supra, reach the point involved in this case. I do not quite comprehend what is meant by the discussion that the act does not "in any true, legal sense, contemplate the taking of private property for public use, or transferring it to another," unless it is meant that actual seizure is necessary, for, under this act, it is just as certain as anything can be that one-fourth to one-third of the coal must remain in place for surface support, for the coal owner, under the Kohler Act, will scarcely provide artificial support, by concrete or stone pillars, or otherwise, at a cost greatly exceeding the value of the coal. Of course, later, the Fowler Act permits its removal as indicated.

The fact the bill does not suggest any such purpose has nothing to do with the intent of the legislature, here enforced by injunction; nor does reference to the different acts regulating the mining of anthracite and bituminous coal. Different rules and regulations must be adopted for different mines, according to working conditions.

Decisions cited in relation to the liquor, oleomargerine or other businesses are distinguishable in that they are real exercise of police power, and where relief was not obtainable in any other way. The mining of coal is an

important factor in our lives. Coal must be procured that the people may live; it is only recently that this court has given expression to such thought: Pioneer Coal Co. v. Cherrytree R. R. Co., 272 Pa. 43, 52. The effect of these laws is to further embarrass the production of coal and reduce the output, as well as confiscate a well-defined property-right in the land.

To summarize, the Kohler Act, as it appears to me, is a confiscatory enactment, under the guise of a police provision, for the following reasons:

1. It is entirely unnecessary, in order to protect life, to forbid mining of coal. A notice such as I have suggested would fully protect all except those who, being of full age and sound mind, voluntarily go where it is not safe for them to be.

2. The provisions of the Fowler Act clearly show that this is merely part of a scheme to force the coal companies to support the surface of owners who have either for value released the right of support or have purchased their lots for a less price by reason of not acquiring this right with their purchase.

3. I can conceive of no reason,—if it be necessary for the public good the surface be supported,—why, as in the case of the Rent Laws, fair compensation should not be provided, save only the desire of the beneficiaries to get something for nothing.

4. If this law were in good faith intended to protect lives and safety from cave-ins caused by underground mining, it would protect from all such subsidences. The paper-books now before us show cases in the appellate courts of this State covering more litigation over subsidences due to bituminous mining than to anthracite.

5. Prior Pennsylvania legislation provided adequate protection to the property of all surface owners except such as had released their protection. It was for the sole benefit of this class that the Kohler Act was passed.

6. The Kohler Act, in effect, confiscates defendant's coal for plaintiff's benefit. Defendant's right to mine

its coal on condition that it accept the Fowler Act and pay two per cent on the value of its total tonnage, or its right to mine on spending on artificial support many times the value of the coal, are rights so obviously illusory as merely to emphasize the real purpose of the act,—to require the coal to be left for all time for the use of the surface owner.

The entire purpose and design of this legislation is clearly, to my mind, to force the coal companies, who have already paid for this property-right once, to pay for it again, and to give to the surface owners a valuable right for which they have already been paid by the parties from whom they now receive it for nothing.

I would affirm the decree of the court below.