**Compass Coal Co., Inc., v. Commonwealth**

*David E. Blakley*, of *Blakley, Ammerman & Jones*, for appellant.

*K. W. Rochow*, for Department of Environmental Resources.

*Ernest Preate, Jr.*, for City of DuBois.

*Benjamin B. Solomon*, for Pennsylvania Game Commission.

By THE BOARD, August 26, 1975—

## HISTORY OF THE CASE

Compass Coal Company, Inc. (hereinafter appellant), has been seeking to operate a bituminous coal strip-mining operation, designated as Baker Run #1, in Huston Township, Clearfield County, Pa.

In 1968, appellant submitted an application for a permit to discharge mine drainage from this proposed operation for consideration by the Sanitary Water Board of The Commonwealth of Pennsylvania,[1] such submission being required under and by virtue of section 315 of The Clean Streams Law of June 22, 1937, P.L. 1987, as amended to August 23, 1965, P.L. 372, sec. 5, 35 P.S. §691.315. The Sanitary Water Board considered this application, caused public hearings to be held thereupon and, in

---

1. The Department of Environmental Resources assumed the functions of the Sanitary Water Board in this regard by the enactment of section 20 of the Act of December 3, 1970, P.L. 834, (No. 275), which amended the Administrative Code of April 9, 1929, P.L. 177, art. 19 A. sec. 1901-a, as amended, 71 P.S. §510-1(22). This transfer of functions was effective January 19, 1971.

the latter part of 1969 or early in 1970, refused to issue a mine drainage permit to appellant.

On or about January 18, 1972, appellant submitted another application for a permit approving the discharge of mine drainage from this proposed operation for consideration by the Commonwealth of Pennsylvania Department of Environmental Resources (hereinafter DER), such submission being required, again, under and by virtue of section 315 of The Clean Streams Law, supra, as amended to July 31, 1970, P.L. 653 (No. 222) sec. 12, 35 PS §691.315.

In this application, No. 4572BSM3, appellant set forth that it was seeking to strip mine 145 acres of coal in Huston Township, Clearfield County, and that this mining would affect a 177-acre area.

On June 12, 1972, DER, by W. E. Guckert, Director, Mine Reclamation Division, issued a written denial of this application to appellant based upon the finding that the strip mining as proposed by appellant would cause acid mine drainage.

On June 21, 1972, appellant filed an appeal from the June 12, 1972, denial to this board.

On or about February 1, 1973, and prior to the date when a hearing on said appeal was scheduled, the City of DuBois (hereinafter referred to as DuBois) filed a petition to intervene with this board. In this petition, it was alleged that DuBois had a vital interest in the proceedings on said appeal since the area proposed to be stripped by appellant is situate near a body of water which had been proposed as an additional source of drinking water for DuBois and other communities. Attached to this petition to intervene was the written consent to such intervention, executed on behalf of appellant by David E. Blakley, Esquire, its counsel.

By order dated February 7, 1973, we granted the petition to intervene filed by DuBois.

We scheduled a hearing on this appeal for April 4, 1973, before Louis R. Salamon, Esquire, hearing examiner.

At the inception of this hearing, Barbara Brandon, Esquire, counsel for the department, indicated that on April 3, 1973, DER had changed its position with regard to this matter to the extent that there was a possibility that appellant might be granted a mine drainage permit for its proposed operation. It was indicated that appellant had agreed to amend its January 18, 1972, application and that DER would expeditiously process this amended application. Counsel for DuBois, Ernest D. Preate, Jr., Esquire, indicated that his client would continue to object to the issuance of a mine drainage permit to appellant and he moved for a continuance of the hearing pending the decision of DER on such amended application. Counsel for appellant and the department joined in that motion for continuance and it was granted.

Although appellant sent an amended application to the proper reviewing officer of DER on April 6, 1973, the department delayed taking any action thereupon. On or about March 14, 1974, this board sent a notice to the parties that a hearing would be held on April 16, 1974, on the June 21, 1972, appeal of appellant, notwithstanding the fact that DER still has taken no action on the amended application.

On April 11, 1974, DER, by Walter N. Heine, Associate Deputy Secretary for Mines and Land Protection, issued a written denial of this amended application for the reason that DER had been notified by the Pennsylvania Game Commission,

owner of the surface rights in the area of the proposed strip mining operation, that it would not provide written consent to appellant to enter upon any of its land to be affected by the said operation within a period of five years after said operation is completed or abandoned, for the purpose of reclamation, planting and inspection, or for the construction of any mine drainage facilities or for the prevention of stream pollution from mine drainage, as required under section 51 of the Surface Mining Conservation and Reclamation Act of May 31, 1945, P.L. 1198, sec. 4 as amended to November 30, 1971, P.L. 554 (No. 147), 52 PS §1396.4(a)(2)I.

At the inception of the April 16, 1974 hearing, counsel for appellant requested orally that the appeal of June 21, 1972, be withdrawn, and that appellant be permitted, then and there, to enter an appeal from the April 11, 1974 action of DER.[2]

Although none of the parties objected to this ruling, counsel for DER stated that, by failing to object, DER waived no rights so to do thereafter. At this posture, counsel for DuBois clearly stated that his client continued to have an interest in the outcome of the proceeding, that his client was going to present evidence to the Board and that the "decision of the Department itself . . . is inadequate to protect the interest of the City of DuBois."

Following this colloquy, appellant began to present testimony in this matter and on April 16, 1974, appellant completed its case in chief. The examiner then questioned counsel for DER as to whether DER had any testimony to offer in this matter. Counsel for DER indicated that it had no testimony

---

2. We received the written appeal of appellant on April 24, 1974.

to present. The hearing resumed on April 16, 1974, with testimony in chief offered on behalf of DuBois.

During the course of the April 16, 1974 hearing, a representative of the Pennsylvania Game Commission (hereinafter referred to as commission) was present and was called as a witness by the examiner. On May 2, 1974, the commission filed a petition to intervene with this board, and on May 9, 1974, this petition was granted.

We took a view of the area in which appellant proposed to conduct its operation on May 14, 1974, and we took further testimony in this matter, from witnesses called by DuBois, on May 14 and 15, 1974.

On or about June 13, 1974, DuBois filed an appeal to this board from the April 11, 1974, action of DER on the amended application of appellant. In this appeal, DuBois indicated that it supported the action of DER in that the stated reason for the denial of the amended application was correct. DuBois indicated further, however, that it objected to the action for the reason that the amended application should have been rejected for a variety of other reasons which it set forth in its appeal.

The hearing on this entire matter resumed on June 24, 1974. During the course of the hearing, counsel for DER moved to quash the appeal of DuBois on the ground that it was not timely filed. Counsel for appellant joined in this motion. The examiner reserved decision on this motion, and the hearing was finally concluded on June 26, 1974.

Hearing examiner Louis R. Salamon submitted a proposed adjudication that is being adopted by the board with a few modifications.

## FINDINGS OF FACT

1. Appellant is a corporation, having its office in Punxsutawney, Pa.

2. Appellee is DER, which is the department of the Commonwealth of Pennsylvania which is vested with the responsibility, inter alia, to act on applications for mine drainage permits submitted pursuant to The Clean Streams Law, supra.

3. Intervenor, DuBois, is a municipal corporation, duly organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania.

4. Intervenor, commission, is an independent commission of the Commonwealth of Pennsylvania, duly organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania.

5. On or about January 18, 1972, appellant submitted to DER an application for a mine drainage permit to operate a strip mine, designated as Baker Run #1, in Huston Township, Clearfield County, Pa.

6. On June 12, 1972, DER issued a written denial of this application to appellant based upon the finding that the strip mining as proposed by appellant would cause acid mine drainage. Appellant filed an appeal to this board from that denial on June 21, 1972. On April 3, 1973, DER advised appellant that it might reconsider its decision after a review of an amended application to be submitted by appellant. Appellant did submit an application to DER on April 6, 1973. On April 11, 1974, DER issued a written denial of this amended application for the reason that DER had been notified by the Pennsylvania Game Commission, owner of the surface

rights in the area of the proposed strip mining operation, that it would not provide written consent to appellant to enter upon any of its land to be affected by the said operation within a period of five years after said operation is completed or abandoned, for the purpose of reclamation, planting and inspection, or for the construction of any mine drainage facilities or for the prevention of stream pollution from mine drainage, as required under section 4(a)(2)I of the Surface Mining Conservation and Reclamation Act, supra, 52 PS §1396.4(a)(2)I. On April 24, 1974, appellant filed a written appeal from said action to this Board.

7. In the proposed operation, 145 acres of coal would be mined and a total area of 177 acres would be affected. The method by which this coal would be mined would be the "modified block cut" method. In this method, one cut is made into the hill and a block is taken out; as each successive block is taken out next to the last one, the overburden is placed in the cut from which the coal has just been removed. By the employment of this method, the amount of coal and deep overburden exposed at any one time is held to a minimum.

8. Mine drainage from this proposed operation would be discharged to an unnamed tributary of the south branch of Bennet Branch, which is sometimes referred to as Baker Run. This unnamed tributary is situate to the west of the area to be affected by the proposed stripping, and at certain points it is within 200 feet of the affected area.

9. The water quality of this unnamed tributary and of the south branch of Bennet Branch at points into which this mine drainage would be discharged is excellent—the pH of these waters is almost neutral; there is little iron or manganese present;

there are only small quantities of suspended solids present.

10. The surface owner of most of the land to be mined and affected by this proposed stripping operation is the commission. This land is designated by the commission as State Game Lands 93. This land is primarily forest area. There is a great deal of hunting and fishing on this land, and it is put to other recreational uses.

11. The commission takes the position that no surface mining is permitted on said land. The commission will not execute a written consent to appellant to enter upon said land within a period of five years after said operation is completed or abandoned, for the purpose of reclamation, planting and inspection, or for the construction of mine drainage facilities or for the prevention of stream pollution from mine drainage.

12. The present water supply of DuBois and several surrounding communities will be inadequate for the needs of the population of DuBois and those communities in 10 to 20 years.

13. DuBois has a plan to impound a portion of the waters in the south branch of Bennet Branch by constructing a dam which would be situate immediately northwest of and downstream from the area to be mined and affected by this proposed stripping. The area which would be covered by water would include a small portion of the area under which there is coal which appellant seeks to strip in its proposed operation. DuBois has taken no formal measures necessary for the implementation of this plan at present.

14. There is not sufficient information set forth in the amended application from which the nature of and from which the acid forming potential of the

overburden in the area proposed to be stripped by appellant can be ascertained. In supplemental "A" of this amended application, appellant has merely set forth the name and thickness of each stratum overlying the coal. Appellant performed no tests to determine the other chemical and physical properties thereof.

15. The sulfur content of the overburden and of the coal in the area proposed to be stripped by appellant is high. The overburden in the area proposed to be stripped by appellant has significant acid forming potential. This information was not supplied to DER by appellant in its application or otherwise.

16. There are numerous well defined streams or water courses which are situate in the area to be mined in this proposed operation, and which would be intercepted by this operation. There is no disclosure in appellant's amended application, or on the map attached thereto and made a part thereof, of the existence of these streams or water courses. Appellant affirmatively set forth in the portion of its amended application known as supplemental "D" that the proposed operation would not involve the relocation of any watercourse or stream.

17. There is a significant potential for acid mine drainage from this proposed strip mining operation to these said streams or water courses, to the said unnamed tributary and to the south branch of Bennet Branch.

18. Because of the steepness of the slopes in the area proposed to be strip mined by appellant, there is a significant potential for erosion to occur during and subsequent to the actual mining operation. As the result of such erosion, the waters of the Commonwealth in and near the area to be affected by this proposed operation will be subject to sedimen-

tation and siltation which are damaging to these waters and to their use.

19. In supplemental "B" of this amended application, appellant has set forth that it will treat discharges of acid mine drainage from the various cuts which will be made into the earth by adding lime to the discharge with a mechanical liming device. Following this treatment, the discharge will be stilled and settled in two successive ponds, the dimensions of which are described in detail in the amended application, before it enters natural drainage courses.

20. In supplemental "B" of this amended application, appellant has made reference to the construction of diversion ditches for two purposes, as follows:

A. To prevent surface water from entering the various cuts or pits, diversion ditches will be built and maintained above the highwall.

B. To abate the problem of siltation from the spoil, ditches will be built below the spoils to carry the runoff to a stilling pond for settlement prior to entering natural drainage courses.

21. Although the precise location of these stilling ponds, which will seemingly serve a dual purpose, to-wit, settlement of the minerals in the mine drainage and settlement of the siltation and sedimentation which will result from erosion, is best determined once actual mining begins, the effectiveness of these ponds for the above purposes cannot be evaluated from the information contained in this amended application because appellant has failed to provide data, information and calculations as to the amount of surface water and soil which can be expected to be discharged into these ponds.

22. Although the precise location of these diversion ditches is best determined once actual mining begins, the effectiveness of these diversion ditches for the purposes set forth in finding of fact no. 20, supra, cannot be evaluated from the information contained in this amended application for the following reasons:

A. Appellant has failed to provide data, information and calculations as to the amount of surface water and soil which can be expected to be carried in these diversion ditches.

B. Appellant has failed to provide data, information and calculations as to the width, length, size and shape of these diversion ditches.

C. Appellant has failed to provide data, information and calculations as to the gradient at which the bottom of these diversion ditches would be constructed.

## DISCUSSION

We have granted the petition of DuBois to intervene, pursuant to our rules of practice and procedure, section 21.14(a), chapter 21, title 25, Rules and Regulations, Department of Environmental Resources, because we are satisfied that DuBois, as a potential user of the water into which mine drainage, siltation and sedimentation generated from this proposed operation would be discharged, had a sufficient interest in the outcome of said proceeding that it should participate therein. Appellant must also have been satisfied that DuBois had such sufficient interest because it consented to the prayer of the petition. We were also satisfied that such interest could be inadequately represented if DuBois was not permitted to intervene.

Under section 21.2(7) of our rules of practice and procedure, supra, DuBois became a party to this appeal when its petition to intervene was granted. Under section 21.33(b) of our rules of practice and procedure, supra, DuBois, as a party, had the right to present relevant and material evidence which it deemed necessary to protect its interest and its standing in this matter. This included the right to present evidence which directed the attention of this board, which was required to hold a hearing de novo in this matter, to certain mistakes and omissions in appellant's amended application which, DuBois alleges, would have caused DER to include additional reasons for the denial of that amended application. See Commonwealth v. Keystone Mutual Casualty Co., 366 Pa. 149, 76 A. 2d 867, 870 (1950).

When, on April 16, 1974, appellant withdrew its appeal from the June 21, 1972, action of DER, and orally appealed from the April 11, 1974, action of DER, the procedural posture of DuBois would have been made completely clear if counsel for DuBois had made a formal statement on the record that his client again sought to intervene to continue to protect its interest and standing. Although no such formal statement was made by counsel, it is, nevertheless, clear to this board, from the continued active participation of DuBois on the record, that DuBois considered itself to be a party to this "new" proceeding.

Neither appellant nor DER can be heard to say that they were deprived of procedural due process by the continued participation of DuBois in this matter, in view of the fact that each such party had, for a long period of time, been on notice of the nature of the opposition of DuBois to this proposed

strip-mining operation and in view of the fact that each such party was not precluded from introducing evidence into the record in this matter to rebut evidence presented by DuBois on April 16, 1974, and thereafter.

We view the appeal which DuBois filed on June 13, 1974, as being an unnecessary effort to protect the interest and standing of DuBois in this matter. Furthermore, because said appeal was not filed within 30 days from April 15, 1974, the date when DuBois, by its counsel, received written notice of the April 11, 1974, action of DER, as is required under section 21.21(a) of our practice and procedure, supra, said appeal must be and is hereby quashed. See Borough of Grove City v. Department of Environmental Resources, E.H.B. Docket No. 74-267-C (issued April 10, 1975).

If DuBois had not intervened in this appeal and if DuBois had not presented evidence in this matter, we would have been faced in this appeal solely with the following issue of law.

Was it proper for DER to deny appellant's amended application for a mine drainage permit, required under section 315 of The Clean Streams Law, supra, 35 PS §691.315, for the reason that DER had previously been notified by the commission, the owner of most of the land proposed to be mined and affected by this proposed strip-mining operation, that the commission would refuse to execute written consent to entry on its said land within a period of five years after the completion or abandonment of the proposed operation, for the purpose of reclamation, planting, inspection, construction of mine drainage facilities or prevention of stream pollution?

As we are convinced that this amended applica-

tion should have been denied for reasons not articulated by DER in its denial action of April 11, 1974, we need not resolve the legal issue noted above. However, we deem it appropriate to offer our comments upon that issue, generally, and upon that issue as it relates to the present matter, in an effort to inject some clarity into a procedure which, at best, is quite confusing.

The "consent to entry" provision to which we have just referred is found in section 4(a)(2)I of the Surface Mining Conservation and Reclamation Act, supra, 52 PS §1396.4(a)(2)I. Such a "consent to entry" must, under that last mentioned section, be included in an application for a surface mining permit which is required under the Surface Mining Conservation and Reclamation Act, supra, before any surface mining can be conducted.

There is no specific provision in either The Clean Streams Law, supra, as it relates to the issuance of a mine drainage permit, or in the rules and regulations which deal with the criteria for the granting of a mine drainage permit, 25 Pa. Code §§99.1-99.40, that such a "consent to entry" must be secured as a prerequisite to the issuance of a mine drainage permit.

DER has argued that its action was proper because there is a necessary relationship between that which an applicant for a mine drainage permit must demonstrate, to-wit, that the proposed mining operation will be conducted in a manner which would prevent pollution (see 25 Pa. Code §99.11) and the very existence of the "consent to entry provision." The department argues, in effect, that if this "consent to entry" authorization does not exist, there is a fatal defect in the position of the applicant for a mine drainage permit from the outset in that

he cannot assure DER that he will be able to enter onto the land of the surface owner to engage in pollution prevention activities within five years after the coal is taken from the cuts or the pits.

This argument, in a general context, is not unreasonable in view of the obvious concern of the legislature, manifested in the July 31, 1970, amendments to The Clean Streams Law, supra, with post-mining activities, including discharges of mine drainage. The term "operation of a mine" in section 315 of The Clean Streams Law, supra, includes backfilling, sealing, other closing procedures and other work done on land in connection with a mine. The term "discharge from a mine" includes a discharge which occurs after the mining operations have ceased. It can easily be said that the department would not be complying with its Clean Streams Law responsibilities if it granted a mine drainage permit to an applicant whose ability to enter land which it had previously mined to abate a pollutional discharge or to perform reclamation or additional backfilling activities could be enjoined by the surface owner.[3, 4]

---

3. It must be noted that under section 316 of The Clean Streams Law, supra, 35 PS §691.316, a non-consenting surface owner can be ordered to allow a mine operator access to the land to, inter alia, abate a pollutional discharge. This provision would, in effect, negate a refusal of "consent to entry."

4. The board has reservations about the constitutionality of this "consent to entry" provision. It can certainly be argued that a provision which, in effect, permits a surface owner to completely prohibit an activity which is otherwise lawful constitutes an invalid exercise of the police power, resulting in a taking of a coal company's property under the 14th amendment. It can also be argued that, if by deed reservation or other contractual provision, a coal company has long had the right to

Although it might be demonstrated that it is reasonable for DER to deny an application for a mine drainage permit because no "consent to entry" assurance was demonstrated, we would have had serious reservations about dismissing this appeal on that basis alone. In the first place, since the "consent to entry" provision has been in effect since January 1, 1972, and since DER and its predecessor well knew that the commission has been opposed to this operation since January 21, 1969, we wonder why it was that DER waited until April 11, 1974, to use this provision as the sword by which this amended application was cut down. We also question why DER even bothered to indicate to appellant, and to this board on April 16, 1973, that there was a possibility that appellant might be granted a mine drainage permit after review of an amended application in view of the existence of this "consent to entry provision" and the well-known opposition of the commission. Suffice it to say that we are seriously disturbed at the fundamental unfairness of DER, directed against appellant when it used this "consent to entry" requirement to defeat appellant on April 11, 1974.

It would appear to this board that the requirements for the issuance of a surface mining permit under the Surface Mining Conservation and Reclamation Act, supra, are inclusive of each and every requirement for the issuance of a mine drainage permit under The Clean Streams Law, supra,

---

extract the minerals from the earth, this "consent to entry" provision has the effect of impairing the obligation of such deed reservation or contract. This is contrary to article I, section 10, cl.1 of the Constitution. See also Pennsylvania Coal Co. v. Mahon, 274 Pa. 489, 118 Atl. 491 reversed, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922).

and the rules and regulations contained in 25 Pa. Code §§99.1-99.40.

This present matter very clearly illustrates the need for DER to seek an amendment to the rules and regulations adopted by the Environmental Quality Board. By this amendment, the necessity for two distinct permits before a surface mining operation can be conducted should be eliminated. There is no absolute requirement in section 315 of The Clean Streams Law, supra, that a mine drainage permit be secured, so long as the rules and regulations otherwise authorize the operation of a mine or a discharge from a mine. Such an amendment to the existing rules and regulations should provide that a single permit to conduct surface mining operations can be granted after DER considers a single application in which the applicant conforms to the criteria set forth in the Surface Mining Conservation and Reclamation Act, supra. Such action is logical and it would put an end to the confusion and potential for duplication of effort which this matter clearly illustrates could exist.

We indicated earlier in this discussion that this amended application should have been denied for reasons which were not articulated by DER in its denial action.

Our beginning point of reference in this regard is section 315 of The Clean Streams Law. This section prohibits a mining operation unless it is authorized by the rules and regulations of the Environmental Quality Board or by a permit issued by the department. The general provision in the rules and regulations which is here applicable is contained in 25 Pa. Code §99.11; it provides as follows:

"Applications for mine drainage permits shall be

submitted on forms provided by the Department and shall include such information that would enable the Department to determine whether or not the proposed mining operation would be conducted in a manner which would prevent pollution to waters of this Commonwealth."

We hold that the department should have found that appellant did not comply with the mandate of the foregoing regulation in the following particulars:

1. Appellant did not set forth sufficient information in its amended application from which either the nature of the overburden or the acid forming potential of the overburden could be ascertained. Furthermore, appellant performed no tests to determine the chemical and physical properties of the overburden. If such information would have been set forth, DER would have been in a position to evaluate the extent and quality of the acid mine drainage which could be discharged from this operation and DER would have been in a better position to evaluate the nature and the extent of the acid mine drainage treatment facilities which appellant had proposed.

2. Appellant did not set forth sufficient information in its amended application with regard to the amount of surface water runoff and soil runoff which could be expected to be discharged into its proposed stilling ponds. Without such information the effectiveness of these ponds, proposed for settlement of the minerals contained in the mine drainage and for settlement of the siltation and sedimentation which will result from erosion, could not be evaluated properly.

3. Appellant did not include sufficient information in its amended application with regard to

erosion control measures. This is illustrated as follows:

Appellant has indicated that it would construct and maintain diversion ditches above the highwall to prevent surface water from entering the various cuts or pits. Appellant has also indicated that it would construct diversion ditches below the spoils to carry soil runoff to a stilling pond for settlement. However, appellant did not set forth data, information and calculations as to the amount of surface water and soil which can be expected to be carried in these ditches, as to the width, length, size and shape of these ditches, and as to the gradient at which the bottom of these diversion ditches would be constructed. Without such information, data and calculations, a proper evaluation of the effectiveness of these erosion control devices could not be made.

There is also a specific provision in the rules and regulations which is here applicable. In 25 Pa. Code §99.37(b) it is provided that "no drainage course shall be intercepted by the stripping operation, unless provision is first made for the conveyance of the natural drainage in an adequate enclosed watertight conduit across the entire stripping operation for discharge to natural water courses." We have found that there are numerous well-defined streams or water courses which are situate in the area to be mined in this proposed operation and which would be intercepted by this operation. Appellant did not disclose that these waters even existed. This is an obvious deficiency in the amended application and it would have constituted, in itself, grounds for the denial thereof. Such disclosure and appropriate pollution control

measures made necessary as the result of such disclosure should have been provided.

These deficiencies in the amended application were or should have been well known to DER for several years prior to April 11, 1974. Since DER elected to present no testimony at the hearing on this appeal, we will never know whether these deficiencies were ignored, whether they were deemed to be insignificant or whether DER, for some unknown reason, elected to have these deficiencies come to our attention via the diligence of DuBois.

It took the effective presentation of DuBois to bring these deficiencies to our attention. Although the result which the department intended, the denial of this amended application, is affirmed by this board, we express extreme displeasure at the performance of the department in this entire matter.

As we have indicated previously, see Rostosky Coal Company v. Department of Environmental Resources, E.H.B. Docket No. 73-178-C (issued June 26, 1974), the methods of review and decision making processes of DER in the area of mining applications must be seriously overhauled if there is to be confidence in the ability of the department to make correct and prudent decisions.

## CONCLUSIONS OF LAW

1. DuBois has standing to intervene in this proceeding. Under §21.2(7) of our rules of practice and procedure, supra, an intervenor becomes a party to the proceeding in which it has intervened. As a party, DuBois had the right to present relevant and material evidence which it deemed necessary to protect its interest and standing, including evi-

dence which directed the attention of this board to certain deficiencies in appellant's amended application which would have caused DER to include additional reasons for the denial of said amended application.

2. The board has jurisdiction over the parties and the subject matter of this proceeding.

3. In order to be entitled to a mine drainage permit under the provisions of The Clean Streams Law, supra, an applicant must show that it has met the requirements of that law and of the rules and regulations adopted pursuant thereto that are applicable to the permit application.

4. Where it has been demonstrated that an applicant for a mine drainage permit has not provided sufficient information in its application for such a permit so as to enable DER to determine whether the proposed mining operation would be conducted in a manner which would prevent pollution of the waters of the Commonwealth, the applicant for such a permit has not met its burden of showing its entitlement thereto.

5. DuBois has demonstrated, to the satisfaction of the board, that there were reasons for the denial of this amended application for a mine drainage permit other than the reason articulated by DER in its denial action of April 11, 1974.

6. Appellant in this matter has not met its burden of showing its entitlement to a mine drainage permit.

ORDER

And now, August 26, 1975, the appeal of Compass Coal Company, Inc., is hereby dismissed.